SCHMIDT v DEPARTMENT OF EDUCATION

Docket No. 90858. Argued November 7, 1991 (Calendar No. 11). Decided September 29, 1992. Rehearing denied *post,* 1202.

Gerald Schmidt, a taxpayer in the Warren Woods School District, and fifty other taxpayers from fifty other school districts brought an action in the Court of Appeals under the Headlee Amendment, Const 1963, art 9, § 32, against the Department of Education and others, contending that the reduction of the state financed proportion of the necessary costs of certain state-required activities and services and the reduction of the proportional funding of social security taxes paid by the districts on behalf of their employees violated art 9, § 29. By order, the Court of Appeals, DANHOF, C.J., and GILLIS and MACKENZIE, JJ., dismissed the complaint for failure to state a cause of action under the Headlee Amendment, reasoning that § 29 would be violated only if the state financed portion of the necessary costs were reduced statewide (Docket No. 132677). The plaintiffs appeal.

In an opinion by Justice BOYLE, joined by Justices BRICKLEY, GRIFFIN, and MALLETT, the Supreme Court *held:*

Because the voters intended neither to freeze legislative discretion nor to permit state government full discretion in its allocation of support for mandated activities or services, the statewide-to-local ratio for calculating the state's funding obligation for existing services and activities under § 29 preserves voter intent by securing a minimum funding guarantee while simplifying calculations and avoiding inequitable anomalies. Social security coverage is not a state-required activity or service within the meaning of the Headlee Amendments.

1. Only the statewide-to-local district funding ratio for calculating the state's obligation pursuant to § 29 gives full effect to the language and purposes the voters sought to achieve in ratifying the Headlee Amendment. The approach requires an initial calculation of the proportion of statewide funding for a particular mandated activity to the total necessary costs of providing that activity. The necessary costs to each local unit in the funding year at issue are then calculated, and the proportion of state financed funding for the activity or service in the base year is compared to the proportion of funding

provided to the district in the year at issue. The state is obligated to afford each unit providing the activity or service the same proportion of funding that the state provided on a statewide basis in the year that the Headlee Amendment was ratified.

2. Section 29 was intended to impose an obligation on the state vis-à-vis each unit of local government with respect to mandated activities or services as well as new requirements. The statewide-to-local method of calculating the state's obligation achieves the voters' desire to secure a minimum level of funding to the local governmental unit for mandatory programs and to link the authority to mandate programs with the necessity of taxing to pay for those programs. It also creates the appropriate balance between the state's desire for discretion in allocating funds and the desire of the local units of government for minimum funding. It provides a uniform allocation of resources for mandatory programs and frees the state to supplement minimum funding on the basis of its perception of need, while the local government is guaranteed its proportionate share. This formulation additionally simplifies the calculation necessary to determine the state's obligation under § 29. Requiring that the state pay each local government the same percentage in a given year avoids some of the anomalies present with a local base-year calculation. New districts, like previously existing districts, are provided the same proportionate share of state funding. The statewide-to-statewide and local-to-local methods each fail in that neither embodies the dual approach reflected in the text and purpose of § 29.

3. Social security coverage is directly imposed by federal law and therefore is not required by state law within the meaning of § 29. Nor is it an activity or service within the meaning of that section. Thus, regardless of how the funding ratio is calculated, it is not a state-required activity or service within the meaning of the Headlee Amendment.

Reversed and remanded for further proceedings.

Chief Justice CAVANAGH, dissenting, stated that the proper interpretation of Const 1963, art 9, § 29, for purposes of assessing the state's compliance in a given year, requires comparison of the state financed proportion of the total necessary costs incurred by all relevant units of local government statewide in providing a specific state-required activity or service in 1978-79 with the state financed proportion provided in the year at issue, i.e., the statewide-to-statewide interpretation.

Section 29 prohibits the state from reducing the state financed portion of the necessary costs of any existing activity

or service required by the state of units of local government. It is eminently logical to calculate necessary costs on the basis of the aggregate costs incurred by all units of local government that are required to provide each activity or service.

Section 29 was designed to bar the state from shifting the cost of activities or services required by state law to local units of government. The statewide-to-statewide interpretation of § 29 in no way conflicts with the purposes of the amendment. As long as the state is prevented from shifting its funding responsibilities onto local governments on an overall, statewide basis, the antishifting goal of § 29 is fully realized and effectuated. Because the plaintiffs have not alleged any aggregate, statewide shifting, their claim under § 29 fails as a matter of law, as does their claim regarding social security coverage.

A comparison of § 29 with § 30 does not support a local-to-local interpretation. The phrase in § 30, "taken as a group," when referring to units of local government, was included to avoid any ambiguity in that section regarding the allocation of state funds to units of local government. Its absence from § 29 does not undermine the statewide-to-statewide interpretation because that interpretation clearly flows from the existing language. Rather, its inclusion would have created ambiguity and confusion.

The statewide-to-local interpretation of § 29 is clearly untenable. It would require interpretation of the language of the statute depending upon whether the base year or the year of the challenged funding was at issue.

Justice Levin, joined by Justice Riley, dissenting, stated that the state violated Const 1963, art 9, § 29 when it reduced funding allocated to particular school districts for mandated programs, and that social security taxes are a necessary cost of providing mandated services.

The Headlee Amendments were added to this state's constitution as part of a nationwide taxpayer revolt. The intent of the voters was to lower taxes and put a ceiling on state spending. Section 29 was added as part of that revolt in an effort to limit legislative expansion of requirements placed on local government to freeze what was perceived as excessive government spending so that there would be no shift of responsibility for services from the state to the local governments without adequate compensation from the state treasury to the local treasuries, i.e., to bar the state from shifting the cost of activities or services required by state law to local units of government. Section 29 requires that the actual cost of providing a state-mandated service or activity must be paid by the state to the

local unit of government. It sought to bar additional taxes both at the local and the state level without voter approval.

The statutory scheme challenged by the plaintiffs and adopted by the dissent validates a budgetary dissimulation that enables the state to avoid this ceiling on state spending by shifting to relatively wealthy school districts the cost of additional state spending to provide aid to poorer school districts. It brings about this result by declaring that the state complies with the edict of § 29 upon enactment of an appropriation bill that tentatively "allocates" to all school districts, wealthy and poor, the amounts required by § 29 to be paid. It ignores that the School Aid Act further provides that amounts so tentatively allocated to wealthy school districts are to be deducted and recaptured to the state treasury. The dissent thus treats the tentative allocations of the amounts required to be paid pursuant to § 29 as satisfying the state's obligation to avoid reducing the state financed proportion of the necessary costs even though the amounts tentatively allocated will not, by reason of the recapture, be fully paid to wealthy school districts. In a word, what is "allocated" need not be paid in order to comply with § 29. The result is that the sums recaptured from the tentative allocations are nothing more than bookkeeping entries, and need not actually be paid. The tentative allocations thus are a sham, unless there is recognition that, by reason of the recapture, the amount tentatively allocated is not the actual application.

The construction adopted by the dissent neuters the prohibition of § 29 of reducing the state financed proportion of the necessary costs of pre-Headlee state-mandated programs. Section 29, as construed by the Court, no longer bars the state from shifting to wealthier school districts the entire cost of maintaining in those school districts pre-Headlee state-mandated programs without any compensation from the state. Insofar as pre-Headlee mandated programs are concerned, school districts, for all practical purposes, have been read out of § 29 as "local units of government." But the Court's construction of § 29 is not limited to school districts. The allocation/recapture charade provides the means of neutering § 29 with respect to all pre-Headlee state-mandated programs, thereby enabling the state to shift to local units of government the cost of providing funds for the state financed proportion of any pre-Headlee state-mandated programs, and thereby freeing the "saving" achieved for expanded state spending for any purpose at the expense of local taxpayers, who either must accept a reduction in other local services or vote for increased taxes at

the local level to provide the funds needed to pay the state financed proportion of the necessary cost of providing the pre-Headlee state-mandated service. The state thereby increases state spending with money provided by local governments. It is apparent from the face of the recapture provision, that the recapture in fact shifts to wealthier school districts the portion of the aggregate, statewide funding responsibility that is recaptured.

Const 1963, art 9, § 29 provides that the state is prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of local government by state law. Section 30 provides that the proportion of total state spending paid to all units of local government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79. Both sections refer to units of local government, but only § 30 specifies that such units are to be taken as a group. Because school districts are a species of local government, the reference in § 29 to units of local government connotes a governmental entity smaller than a group comprised of all school districts in the state and suggests that § 29 refers to individual school districts.

If "taken as a group" is read into § 29, and the state may recapture funds allocated to mandatory educational programs, local taxpayers effectively would be required to choose between raising their taxes or cutting back on traditional core educational programs and significant traditional extracurricular activities. Such a narrow reading of § 29 effectively would deprive many school districts of any protection under § 29. The state would be allowed to do incrementally what it is otherwise prohibited from doing comprehensively.

Social security coverage is part of the state financed proportion of the necessary costs of providing mandated services under § 29, but not of providing education generally. Since 1989, state law has provided for the recapture from wealthier school districts and reallocation to needier school districts of funds dedicated to social security coverage for school employees. To the extent state funds were allocated in the base years for social security coverage of employees engaged in general education, the funds were not used to defray a necessary cost of an activity or service required by state law. To the extent, however, that state funds were then allocated for social security coverage of employees engaged in mandated programs, such funds defrayed necessary costs of providing mandated services. Accordingly, § 29 requires that the cost of funding social security coverage for school employees engaged in the

delivery of mandated services be included in the calculation of
the necessary costs of those services in each district.

*Hardy, Lewis, Pollard & Page, P.C.* (by
*Dennis R. Pollard*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Gay Secor
Hardy,* Solicitor General, and *Paul J. Zimmer* and
*Jane D. Woodfin,* Assistant Attorneys General, for
the defendants.

Amici Curiae:

*Hardy, Lewis, Pollard & Page, P.C.* (by
*Dennis R. Pollard* and *Richard E. Kroopnick*), for
Donald Durant, Jack Kennedy, Hillary Kutella,
Edward Rishavy: Taxpayers of the Fitzgerald
School District, and Fitzgerald Public Schools.

*Sachs, Kadushin, O'Hare, Helveston & Wald-
man, P.C.* (by *Theodore Sachs, Eileen Nowikowski,*
and *Andrew Nickelhoff*), for Detroit Federation of
Teachers.

*White, Beekman, Przybylowicz, Schneider &
Baird, P.C.* (by *Cynthia Williams Irwin*), for Michi-
gan Education Association.

BOYLE, J. The question presented is the proper
interpretation of the first sentence of § 29 of the
Headlee Amendment, Const 1963, art 9, §§ 25-34.
The question arises against a backdrop of complex
issues including equitable school financing, the
intricacies involved in state school aid formulas,
and the fiscal problems of the state. These under-
lying issues shape the arguments of the parties
and amicus curiae and color their perspective.
However, mindful of the fact that construction of a
constitutional provision enacted as a result of
voter initiative requires a special emphasis on the

duty of judicial restraint,[1] our interpretation is ultimately drawn from the words of the amendment and our understanding of the purpose the voters sought to effectuate by ratification.[2]

The principal theories of the parties may be fairly summarized as a claim by local units of government that they are entitled to funding of mandated state programs on a unit by unit basis and a claim by the state that the Headlee obligation is met by funding a proportionate share of the mandated activity on a statewide basis wherever it is spent. Thus, having examined the language of § 29 supporting their respective positions, Justice LEVIN's dissent ultimately turns on the belief that the voters intended to preclude *any* shift of responsibility for mandated services from state to local governments, *post,* p 285, while the opinion of the Chief Justice implicitly accepts the proposition that the voters adopting the Headlee Amendment intended that the state could fulfill its Headlee obligation by discretionary redirection of amounts recaptured from mandatory programs, *post,* pp 274-275.

Because we conclude that the voters intended neither to freeze legislative discretion nor to permit state government full discretion in its allocation of support for mandated activities or services, we hold that the statewide-to-local ratio for calcu-

[1] See Posner, *Legal formalism, legal realism, and the interpretation of statutes and the constitution,* 37 Case W R L R 179, 189 (1986):

> In our system of government the framers of statutes and constitutions are the superiors of the judges. The framers communicate orders to the judges through legislative texts. . . . If the orders are clear, the judges must obey them.

[2] *Durant v State Bd of Ed,* 424 Mich 364; 381 NW2d 662 (1985); *Livingston Co v Dep't of Management & Budget,* 430 Mich 635, 642; 425 NW2d 65 (1988). We stressed that the meaning must be clarified in light of the circumstances of adoption of the provision and the purpose sought to be achieved by the voters who ratified it.

lating the state's funding obligation for existing services and activities under § 29 preserves voter intent by securing a minimum funding guarantee while simplifying calculations and avoiding inequitable anomalies. We further hold that social security coverage is not a state-required activity or service within the meaning of the Headlee Amendments.

I

Section 29 of the Headlee Amendment provides:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

The plaintiffs in this case, fifty-one Michigan school districts and fifty-one taxpayers residing in each of those districts,[3] contend that the state has

[3] The plaintiff school districts are those of Alcona, Allen Park, Ann Arbor, Avondale, Birmingham, Bridgman, Caledonia, Center Line, Charlevoix, Crestwood, Dearborn, East China Township, East Grand Rapids, East Lansing, Elkton-Pigeon-Bay Port, Essexville-Hampton, Farmington, Forest Hills, Frankenmuth, Grand Blanc, Grand Haven, Grosse Ile, Grosse Pointe, Harper Woods, Holland, Lake Orion, Lamphere, Livonia, Midland, North Huron, Northville, Novi, Plymouth-Canton, Portage, Riverview, Rochester, Royal Oak, Saginaw Township, St. Joseph, Saugatuck, South Lake, South Redford, Southfield, Tawas, Trenton, Troy, Warren, Warren Woods, Waverly, West Bloomfield, and West Ottawa. The lead named plaintiff, Gerald Schmidt, is a taxpayer residing in the Warren Woods School District.

violated § 29 by reducing the state financed proportion of the necessary costs incurred by the plaintiff school districts in providing certain state-required activities and services.

When the Headlee Amendment was adopted by the voters of Michigan as part of the Michigan Constitution in 1978, state law provided for programs for special education, special education transportation, bilingual education, and lunch and supplemental milk.[4] Since the adoption of the Headlee Amendment, the Legislature has appropriated funds to school districts pursuant to the State School Aid Act, MCL 388.1601 *et seq.*; MSA 15.1919(901) *et seq.,* as amended annually. The act generally provides for two types of state funding: "restricted" and "unrestricted." Unrestricted funds can be used for any school-related purpose authorized by law. Restricted or "categorical" funds are earmarked for specific programs, some of which are voluntarily provided by local districts, and some of which are mandated by state law.

The state allocates unrestricted funds according to a formula, set forth in § 21(1) of the act, that guarantees to each district a minimum level of funding per pupil. Generally speaking, the amount of unrestricted funds provided per pupil equals the difference between the amount guaranteed and the amount per pupil generated from local revenues.[5] Districts are only eligible to receive unrestricted funds if the amount of revenue per pupil generated locally does not exceed the amount of funds guaranteed per pupil by the state. Districts that are so eligible are said to be "in-formula." Districts

---

[4] See MCL 380.1751; MSA 15.41751 (special education); MCL 380.1756; MSA 15.41756 (special education transportation); MCL 380.1153; MSA 15.41153 (bilingual education); MCL 380.1272a; MSA 15.41272(1) (lunch and supplemental milk programs).

[5] The formulas for allocating restricted or categorical funds vary with each program.

whose local revenues per pupil exceed the state-guaranteed amount are ineligible for unrestricted funds and are said to be "out-of-formula."[6]

The act contains a "recapture" or "base revenue deduction" provision appearing in § 21(5) as amended by 1990 PA 207 and 1991 PA 118.[7] This provision authorizes the "recapture" of funds tentatively allocated to an out-of-formula district[8] under all other provisions of the act, including funds allocated for mandated categorical programs. The recaptured funds are withheld from out-of-formula districts and are available for distribution to in-formula districts in accordance with the act. The amount of the recapture or base revenue deduction is determined according to a complex set of formulas, the details of which are not relevant here.[9]

It is this recapture provision that, according to the plaintiffs, has resulted in a violation of § 29 of the Headlee Amendment by reducing the state

[6] All of the plaintiff school districts in this case were, at the time this litigation commenced, out-of-formula districts.

[7] In earlier versions of the act, this provision appeared in § 21(4). The plaintiffs in this case allege that the recapture provision has resulted in violations of § 29 of the Headlee Amendment since 1979, continuing to the present. However, they focus primarily on the violation that they allege resulted from § 21(5) as amended by 1990 PA 207, which, they allege, resulted in substantially greater base revenue deductions from out-of-formula districts than had previously been the case, to the point, they allege, that some of the plaintiff out-of-formula districts have received no state funding at all for state-mandated categorical programs. The plaintiffs do not address the effect of § 21(5) as amended by 1991 PA 118, because that amendment postdated the filing of the plaintiffs' amended complaint.

[8] Section 21(5) states that it applies whenever "the net allocation computed for a district pursuant to subsection [21](1) is a negative amount . . . ." Such a district is, by definition, an out-of-formula district.

[9] The recapture amount is initially set as the "negative amount" computed under § 21(1), i.e., the amount by which the district's local revenues exceed the state-guaranteed level of funding. That amount, however, is then subject to further qualifications and adjustments pursuant to the formulas provided.

financed proportion of the necessary costs incurred by the plaintiff school districts in providing the activities and services mentioned above.

The plaintiffs also allege that the state has violated § 29 by reducing its prior one hundred percent proportional funding of the plaintiff school districts' employer share of federal social security taxes paid on behalf of their employees. Since 1987, the state, in accordance with federal law, has required local school districts to remit all federal social security taxes directly to the appropriate federal agency. At the same time, the state has undertaken to appropriate to each district funds sufficient to cover the district's employer share of such social security taxes. See MCL 388.1746; MSA 15.1919(1046), originally enacted by 1987 PA 128, as amended annually ("§ 146"); see also MCL 38.1341(9); MSA 15.893(151)(9), as amended by 1989 PA 194.[10]

Before 1989, § 146 was included in a list of provisions under which the funds due school districts were exempted from recapture. See MCL 388.1621(5); MSA 15.1919(921)(5), as amended through 1988 PA 318. The Legislature, however, in 1989 PA 197, removed § 146 from that list, thus subjecting to recapture the funds allocated for reimbursement of the social security taxes paid by out-of-formula districts.[11] See MCL 388.1621(7); MSA 15.1919(921)(7), as currently amended.[12] This,

[10] Before 1987, the state was directly liable under federal law for the employer share of social security taxes paid on behalf of local government employees. For 1987 and subsequent years, however, federal law imposes this obligation directly on units of local government. See PL 99-509, § 9002, 100 Stat 1874, 1970-72 (enacted October 21, 1986), codified principally at 26 USC 3126; 53 Fed Reg 32973 (August 29, 1988).

[11] The plaintiffs mistakenly identify this change as originating in 1990 PA 207.

[12] This provision was redesignated from § 21(5) to § 21(7) by 1990 PA 207.

according to the plaintiffs, has resulted in the unconstitutional reduction of the state financed proportion of social security taxes paid on behalf of their employees.

The plaintiffs filed their original complaint in the Court of Appeals, pursuant to § 32 of the Headlee Amendment,[13] on September 13, 1990, and filed an amended complaint on October 9, 1990. The Court of Appeals, on November 9, 1990, dismissed the complaint for failure to state a cause of action under the Headlee Amendment.[14] The Court reasoned that the plaintiffs had alleged only a reduction of the state financed proportion of their particular budgets on a unit-by-unit basis, and that § 29 would be violated only by a reduction of the state financed proportion of the necessary costs of any existing state-required activity or service as calculated on an aggregate, statewide basis, covering all relevant units of local government.[15] The Court, on January 14, 1991, clarified

[13] Section 32 provides:

> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

[14] Unpublished order entered November 9, 1990 (Docket No. 132677).

[15] The Court of Appeals dismissed count VI of the plaintiffs' complaint, dealing with the social security claim, on the ground that it did not purport to raise any issue under the Headlee Amendment, and was therefore outside the Court's jurisdiction under § 32. As the Court noted, count VI appears to assert only certain alleged rights of the plaintiff school districts as third-party beneficiaries of an agreement regarding social security coverage entered into in 1951 between the State of Michigan and the federal Social Security Administration, and that the state is in breach of its obligations under that agreement by reducing its funding of the plaintiff school districts' social security taxes paid on behalf of their employees, pursuant to the recapture provision.

The Court of Appeals was correct in holding that such a contractual

the reasoning of its earlier order and denied re-hearing.[16] The plaintiffs applied for leave to appeal to this Court, which we granted on April 23, 1991. 437 Mich 974.[17]

In our order granting leave to appeal, we directed the parties

to include among the issues to be briefed (1) whether the obligation of the state under Const 1963, art 9, § 29 should be measured by one of the following: (a) the ratio of total state aid for a required activity to total necessary costs for the required activity in the base year compared with the ratio of total state aid for the activity to total necessary costs for the activity in the year of

claim falls outside the limited jurisdiction conferred by § 32. However, while the complaint is inartfully worded, it can be construed to assert a claim that the alleged reduction in social security funding as a result of the recapture provision violates § 29. While count VI does not explicitly refer to § 29, paragraph 49 of count VI does "reallege and incorporate" the preceding paragraphs of the complaint. Paragraph 45 of the complaint explicitly refers to MCL 38.1341(9); MSA 15.893(151)(9) (dealing with state funding of school districts' social security taxes paid on behalf of their employees) as dealing with one of the activities or services allegedly required by state law, with regard to which the state has allegedly failed to meet its funding obligations. Count V, paragraphs 42-48, generally asserts that the state's failure to meet its alleged funding obligations with regard to both social security taxes and other mandated school programs violates § 29. Thus, we construe the plaintiffs' social security claim in this regard as being, on its face, within the jurisdiction conferred by § 32, and we address it on the merits.

[16] Unpublished order entered January 14, 1991 (Docket No. 132677). The Court of Appeals, in its earlier order, had mistakenly cited this Court's decision in *Durant*, n 2 *supra*, 424 Mich 392-393, for the proposition that units of local government must be "taken as a group" under § 29. In fact, the phrase "taken as a group" appears only in § 30 of the Headlee Amendment, not § 29, and the cited discussion of the "taken as a group" concept in *Durant* dealt only with § 30. In its subsequent order on rehearing, the Court clarified its reasoning by holding that the "taken as a group" principle nevertheless applies to § 29 because the first sentence of § 29 refers to "units of Local Government" in the plural.

[17] We had previously denied as moot the plaintiffs' complaint for superintending control filed in response to the Court of Appeals original order. Unpublished order entered February 5, 1991 (Docket No. 90718).

challenged funding; (b) the ratio of state aid to an individual local unit of government for a required activity to necessary costs of that unit for the activity in the base year compared with the ratio of state aid to the unit for the activity to the necessary costs of that unit for the activity in the year of challenged funding; (c) the ratio of total state aid for a required activity to total necessary costs for the required activity in the base year compared with the ratio of state aid to an individual local unit of government for the activity to the necessary costs of that unit for the activity in the year of challenged funding; or (d) such other ratios as advanced by the parties . . . . [*Id.*][18]

II

A

The first two sentences of § 29 provide:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs.

Only the statewide-to-local district funding ratio for calculating the state's obligation pursuant to § 29 gives full effect to the language and advances

---

[18] We also directed the parties to brief "(2) whether plaintiffs stated a cause of action under Const 1963, art 9, § 29 with regard to state funding of plaintiff school districts' contributions under the Social Security Act, 42 USC 301 *et seq.*, and 1951 PA 205, MCL 38.851 *et seq.*; MSA 17.801 *et seq.*, as amended." *Id.*

the purposes that voters sought to achieve in ratifying the Headlee Amendment.

This approach requires an initial calculation of the proportion of statewide funding for a particular mandated activity to the total necessary costs of providing that activity.[19] The necessary costs to each local unit in the funding year at issue are then calculated. Next, the proportion of state financed funding for the activity or service in the base year is compared to the proportion of funding provided to the district in the year at issue. The state is obligated to afford each unit providing the activity or service the same proportion of funding that the state provided on a statewide basis in the year that the Headlee Amendment was ratified.

The first sentence of § 29 speaks of "*the* state financed proportion," suggesting a single proportion of multiple necessary costs for state-required activities and services. While not direct enough to be certain, the language suggests that the electors thought that a common percentage would be applied to measure the state's obligation to fund each activity or service.[20] The question is whether, in the year at issue, i.e., the payout year, each unit of local government is entitled to the same percentage.

In *Durant v State Bd of Ed,* 424 Mich 364, 379; 381 NW2d 662 (1985), we interpreted the language in § 29 to "reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibilities to the local government . . . ." *Durant, supra,* p 379. We explained that

[19] We discussed the meaning of "necessary costs" in *Durant,* n 2 *supra,* observing that it meant "actual cost to the state" and suggesting that "[a]ctual cost in the marketplace is also a reliable measure of what must be paid in order for a service or activity to be provided." *Id.,* p 391.

[20] Chief Justice CAVANAGH emphasizes this statewide focus of the text of the first sentence of § 29. *Post,* pp 264-268.

the two sentences must be read together "[b]ecause they were aimed at alleviation of two possible manifestations of the same voter concern . . . ." *Id.* That reasoning suggests that the section was intended to impose an obligation on the state vis-à-vis each unit of local government with respect to mandated activities or services as well as new requirements. The first sentence focuses on a single proportionate obligation by the state measured during the base year, i.e., the year that the Headlee Amendment became effective. The only language in § 29 that speaks directly to payment occurs in the second sentence, which requires a "state appropriation . . . to pay *the* unit of Local *Government* for any necessary increased costs."[21] (Emphasis added.) This language references a singular unit and a singular governmental body. It suggests that the framers intended, and the voters understood, that the state's obligation ran to each unit of local government. Thus, although the language is indirect, the section as a whole supports the state-to-local method.[22]

---

[21] The heart of Justice LEVIN's analysis is the second sentence and the interplay of language between § 29 and § 30. He highlights, in particular, the absence of the words, "taken as a group," in § 29 and emphasizes the local focus for the payout. *Post,* pp 299-301.

[22] Contrary to Chief Justice CAVANAGH's suggestion, the construction that we propose is not "untenable." *Post,* p 275. Chief Justice CAVANAGH attempts to refute the state-to-local method by submitting that the "relevant phrase" can "have only one meaning" and must therefore "apply both to the base year and the year of challenged funding." *Id.,* p 276. We cannot accept this reading. In order to apply § 29, three ratios are required: 1) the ratio in the base year, 2) the ratio in the payout year, and 3) the ratio between the two years. It is apparent that the language prohibits a reduction of state funding, and, thus, requires funding in the payout year to remain equal to or greater than funding in the base year. While this ratio is clear, the text of § 29 fails to precisely articulate the components of the other two ratios. Neither plaintiffs nor the state have been able to precisely locate in the text the components of a base-year or payout-year ratio. Each contends that the language supports a particular ratio, while discounting additional language counseling for a different ratio. The problem, of course, is that the actual computations by any resolution

The state-to-local formulation satisfies the voters' intent in enacting the Headlee Amendment. When the voters ratified the Headlee Amendment, they sought to ensure that when the state mandates a program, funds are provided to the local government to pay for that program. The state-to-local method of calculating the state's obligation achieves the voters' desire to secure a minimum level of funding for the local government unit for mandatory programs and to link the mandating of programs with the necessity for taxing to pay for those programs. This approach also creates the appropriate balance between the state's desire for discretion in allocating funds and the desire of the local units of government for minimum funding. The state-to-local ratio provides a uniform allocation of resources for mandatory programs. The state is free to supplement that minimum funding on the basis of its perception of need, but the local government is guaranteed its proportionate share.

The state-to-local formulation also simplifies the calculations necessary to determine the state's obligation pursuant to § 29. Calculating the state financed proportion in the base year under the local formulation would entail numerous complicated questions regarding each governmental entity's spending in the year that the Headlee Amendment took effect. In contrast, using a statewide method for calculating the percentage in the base year entails examining the necessary costs to the state in relation to the state's proportionate share of funding, a single calculation.

Requiring the state to pay each local govern-

of this dispute are more complex than that suggested by the amendment's singular reference to a "proportion." However, our interpretation is faithful to that language. The state-to-local method results in a single proportion, but one that is derived from a comparison of statewide aggregate funding in the base year and then applied to the funding of local units of government in the payout year.

ment the same percentage in the payout year will also avoid some of the anomalies present with a local base-year calculation. For example, if a district in existence in the base year was not providing a mandatory program when the Headlee Amendment took effect, this method would entitle the district to the same proportionate share as every other local unit that previously provided the programs. This formulation also simplifies funding where new districts are created by consolidation, or reorganization, or otherwise. If the newly organized district adds a program that was "mandated" when the Headlee Amendment took effect, any district providing the program is then entitled to the same proportionate share as every other unit providing the activity or service. Thus, the anomaly of funding at either zero or one hundred percent (pursuant to the second sentence of § 29) is avoided. New districts, like previously existing districts, would be entitled to the same proportionate share of state funding.

B

Section 29 of the Headlee Amendment embodies a dual view of government; the voters' purpose comprehended balancing the rights and obligations of state and local governments. The state-to-state and local-to-local methods each fail for the same reason—they do not embody the dual approach that was reflected in the text and purpose. The state-to-state approach focuses on the first sentence of § 29 and its reference to a single statewide proportionate share. The local-to-local formulation stresses the second sentence of § 29 and its reference to payment to individual units of government. Rather than viewing these two approaches as embodying conflicting principles requiring a

choice, the state-to-local method gives effect to the supplementary principles embodied in the statute and most closely captures the full meaning and spirit of the text of § 29.

This dual purpose is reflected in the language of § 25:

> Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval. The state is prohibited from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government. [Const 1963, art 9, § 25.]

The text reflects the Headlee Amendment's purpose of limiting the state's discretion in several ways. First, it expresses the desire to prohibit the state from requiring new or expanded activities without fully funding them. The clause that embodies this purpose refers to funding for "local governments," a plural reference, which implicitly suggests that funding must be provided to those local governments of whom the programs are required. Second, the language evidences a purpose of preventing the state from reducing "the proportion of state spending in the form of aid to local governments." This language again includes a singular description of the state spending "proportion" along with a plural reference to the "local governments" that are receiving the aid. Finally, the language embodies an antishifting purpose that prevents the state from shifting "the tax burden to local government." This text evidences the aggregate antishifting purpose embodied in the text of § 30. It also may be read to incorporate an absolute prohibition of any shifting to local gov-

ernment, including the type of shifting advocated by the state and supported by Chief Justice CAVANAGH.

The Chief Justice contends that the state financed proportion of the necessary costs of an existing activity or service does not mean the state financed proportion of the necessary costs of each unit of local government. Rather, he asserts that the state financed proportion of the necessary costs should be calculated on the basis of the necessary costs of all units of local government that provide the activity or service in the aggregate. *Post,* pp 266-267. Relying on the plural "units of Local Government" and the framers' failure to include language specifying "each unit," it is concluded that "the statewide-to-statewide interpretation appears to be the most logical and persuasive way to read the provision." *Id.,* pp 267-268. According to Chief Justice CAVANAGH, the language of § 30 neither supports nor undercuts the interpretation that he favors for the text of § 29. *Id.,* pp 271-273. Thus, he rejects Justice LEVIN's assertion that when § 29 and § 30 are read together, it becomes apparent that § 29 was intended to prevent shifting in respect to the local units of government, while § 30 was intended to prevent shifting in respect to the local governments in the aggregate.

Chief Justice CAVANAGH insists that the voters' antishifting purpose is adequately realized by adopting a statewide-to-statewide formula for measuring the state's § 29 obligation. *Post,* p 269. He observes that the unit-to-unit interpretation "require[s] the state to subsidize . . . wealthier districts in perpetuity," *id.,* p 269, n 6, when no evidence suggests that voters sought to achieve that result. To the extent that this observation rests on the assumption that the state will not keep its promise to educate all of Michigan's chil-

dren because the political costs are too high,[23] it is wide of the mark. To the extent it rests on the text and purpose of the first sentence of § 29, it is likewise not well taken. The state is not prohibited from redirecting other revenue in the interest of equalization, nor is it required to maintain mandatory programs in perpetuity. All that Headlee requires is that when the state mandates a program one factor in its determination of whether to require the activity or service must be the proportionate share of funding that the state must bear.

The state-to-state formulation is also contrary to implicit assumptions that this Court acted on in *Durant*. In *Durant,* we analyzed the state's potential funding obligation under § 29 by considering the effect of funding decisions on the local unit of government. As the *Durant* plaintiffs correctly observed in an amicus curiae brief filed with this Court, both the parties, this Court, and panels of the Court of Appeals have proceeded on the assumption that § 29 had application to each unit of local government, and not in any aggregate sense. The rule of "common understanding," as described by Justice COOLEY, is applicable here. He explained that the constitutional construction to be given to a provision should give voice to the interpretation that " 'the great mass of the people themselves, would give it.' " *Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley, Constitutional Limitations (6th ed), p 81. The parties, the Court, and the state assumed in *Durant,* litigation that closely followed the effective date of the Headlee Amendment, that a payout to each governmental entity was required. Although this assumption does not constitute a holding, it nevertheless constitutes some

[23] See Donohue, *The Headlee Amendments: Friend or foe of local government?*, Laches—Oakland Co Bar Ass'n (April 1992), p 14.

evidence that the language of § 29 does not compel a state-to-state approach.[24]

Use of aggregate funding in the payout year as required by the state-to-state method frustrates the voters' purpose as understood by this Court in both *Durant* and *Livingston Co v Dep't of Management & Budget,* 430 Mich 635; 425 NW2d 65 (1988). We emphasized in *Durant* that the two sentences of § 29 must be read together. We explained that both "clearly reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to the local government, once its revenues were limited by the Headlee Amendment, in order to save the money it would have had to use to provide the services itself." *Id.,* p 379. We further explained that "while the voters were concerned about the general level of state taxation, they were also concerned with ensuring control of local funding and taxation by the people most affected, the local taxpayers." *Id.,* p 383. We rejected an interpretation of the scope of § 29 on the basis that it "would . . . force some taxpayers to supplement

[24] A short time after the Headlee Amendment was ratified by the voters, its drafters prepared notes reflecting their view of the amendment's intent. Although the drafters' notes are not authoritative, *Durant, supra,* p 382, n 12, they are one piece of evidence concerning the common understanding of the voters' intent. The notes state:

No mandated activity or service should be legally binding on any local unit until the appropriations for such mandated activity or service is made and disbursed to the applicable local units.

\*   \*   \*

This section does not necessarily prevent the state from shifting funds from general and unrestricted revenue sharing to the funding of a state mandated activity but it does prohibit shifting funds from state mandated programs unless the mandate for such programs is eliminated.

The notes support the notion that § 29 sought to connect the state's programing requirements with its funding requirements.

the school district budgets of others" when the "supplementing taxpayers would have no control over how those funds would be spent . . . ." *Id.*

State-to-state funding fails to protect local units of government from the need to increase taxes for state-required programs and permits the state to fund some state programs by shifting moneys away from certain local units of government and toward others at the state's sole discretion.[25] Pursued to its logical conclusion, this rationale would allow the state to meet its Headlee obligation by funding the cost of all mandated services in one county and none in the other eighty-two. The Headlee Amendment sought "to link funding, taxes, and control," balancing rights and obligations at both the state and local levels. *Durant, supra,* p 383. Yet, the state-to-state method fails to effectuate the intended protection when viewed from the perspective of the local taxpayer.

[25] Defendant argues the merits of its decision to shift categorical funds from "wealthier" districts to poorer districts. However, as Chief Justice CAVANAGH points out, the merit of the shift is not before us. The sole question is whether § 29 of Headlee prevents such a shift. If the state has the power to shift funds, it may shift funds from poorer districts to wealthier as well as from wealthier to poorer. Furthermore, although the state argues that it ought to retain discretion to increase funding, tacitly suggesting that it will shift funds to districts more in need of funding, that result is not required or prevented under the state's interpretation. The parties agree that the base revenue deduction, the device by which the state has shifted funds, is based on the local millage, the adjusted gross income of residents per child, and the school district's state equalized valuation per child. A district with a great deal of vacant land per child (such as rural districts in northern Michigan) might be deemed "wealthy" under the formula. But when land is vacant and not producing income, residents will be unable to pay, and unwilling to enact, increased millage.

Redistributing income to insure equality of education is good policy. However, nothing in the state-to-state ratio requires the state to follow that policy. The state could transfer money the other way, as it appears to do in part in sparsely populated districts. Most importantly, the policy of redistributing income is unrelated to the funding of the programs protected by the Headlee Amendment. To the extent that redistribution has any relation to Headlee, it seems to violate the amendment's intent to protect local district income.

Ultimately Chief Justice CAVANAGH concludes that "as long as the state does not attempt to shift its aggregate, statewide funding responsibilities" onto local units of government, it has satisfied the Headlee obligation established in § 29. (Emphasis deleted.) *Post,* p 270. Implicit in this analysis is the assumption that the drafters of the amendment were content to let the acceptability of discrete decisions within the aggregate responsibility, be evaluated in the polling place. It is this proposition that is most difficult to square with what we perceive to be the voters' intent.[26] If there is anything that the referendum was motivated by, it is that those who introduced it did not believe that the legislators' determination of local responsibilities and its distribution of resources to local government could be fully harnessed by the political process. Although the statewide approach may ensure that the state saves no money[27] from any shifting of funding between local units of government, it fails to protect all local taxpayers from the need to increase taxes to pay for programs over which they lack control. In other words, the statewide approach permits the state to shift funding from some districts to others while still requiring those districts to carry out mandated pro-

[26] Chief Justice CAVANAGH answers this argument regarding the drafters' intent by urging that it is "fundamental" that the state "is free to do whatever it wants to do, subject only to the democratic verdict of the voters." *Post,* p 280. What this rejoinder misses is that this opinion seeks to discover and effectuate the intent of the voters in adopting the antishifting portion of the Headlee Amendment. That is, the "democratic verdict of the voters." *Id.* A vivid contrast between the Chief Justice's opinion and this opinion is the absence in the Chief Justice's opinion of any discussion on whether the voters' common understanding of the antishifting provision of the Headlee Amendment gave any protection to local taxpayers in their capacities as taxpayers of each local unit of government.

[27] Even this is a fallacy. The state saves the money that it otherwise would have had to spend to raise in-formula districts to the state-desired level of funding. The money is "saved" by use of the recapture formula.

grams. This separation of the taxing question from the programing question is contrary to one of the primary purposes of the Headlee Amendment. See *Durant, supra,* p 378.

The argument for adoption of a local-to-local method for calculating the state's Headlee obligation pursuant to § 29 is also not persuasive. Justice LEVIN asserts that the words "taken as a group" should not be read into § 29 in contradistinction to § 30 where the framers included them, and concludes that the proper method to measure the state's § 29 Headlee obligation is to compare the state financed proportion of local funding in the base year to the state financed proportion of local funding in the year at issue. He rejects the aggregate approach to the state's obligation under § 29 because it would "effectively deprive many school districts of any protection under § 29" and force them to raise local taxes. *Post,* p 307.

Like the observations of the Chief Justice, these observations are inapposite. The question is not whether the local districts will be forced to raise local taxes to support their programs of choice, it is whether the state may mandate programs for which it does not pay a proportionate share. Justice LEVIN also maintains that, unless a local-to-local ratio is employed, wealthier districts will be presented with the "Hobson's choice" of raising taxes or cutting programs contrary[28] to the purpose of the Headlee Amendment. *Id.,* p 308.

However, enforcing a local ratio in the base year would freeze funding at widely varying propor-

---

[28] Although it has not been argued, the drafters' notes suggest that the "Hobson's choice" perceived may be illusory, at least for future funding years. If the view that a local unit is not legally obligated to offer an unfunded mandated program was found to be authoritative and applicable to programs mandated before Headlee was adopted, the local unit would have local control of its resources, in which case offering the "mandated" program would be a real choice.

tions[29] that would guarantee disparities and se-
verely limit the state's ability to exercise discre-
tion in the allocation of funds. We do not view the
Headlee Amendment as being the voters' expres-
sion of intent to freeze the status quo. Indeed, as
we observed in *Durant,* "egregious mandated dis-
parities would seriously affect the state's ability to
provide the basic necessities for a 'free education'
to all students . . . ." *Id.,* p 384.[30] Use of a local
ratio in the base year as advocated by Justice
LEVIN would freeze the state's obligation in dispa-
rate proportionate shares, virtually mandating in-
equitable school financing. Varying shares of state
funding not related to programing presumably
reflected the relative wealth or need of the dis-
tricts as determined by the Legislature. But, if the
Headlee Amendment freezes those disparities, the
proportionate share a local district obtains will no
longer be on the basis of relative need, it will be

[29] Because the record in this case is not well developed, we do not
know precisely what gave rise to the variance in funding during the
base year. Funding disparities may be program related. It is possible
that some districts provided more than the minimum requirements
for mandated programs and earned extra funds by so doing. These
variances should disappear after deciding what constitutes a neces-
sary cost. The state also may have had different funding rates for
distinct service delivery methods. For example, the state may have
funded a program offered in a regional school at a higher level than if
it was housed at a single neighborhood school. These variances may
be avoided by a proper determination of the scope of each mandated
service or activity. Variances also might have been created by block
grant funding. For example, the state might have provided a mini-
mum basic amount to each school that provided a program such as its
first ten-thousand dollars in cost.

[30] Indeed, we employed an example that emphasized the inequity in
freezing a proportion so that one district would forever be entitled to
fifty percent of its budget in state aid while another would get only
twenty-five percent, regardless of "how the property values declined
in succeeding years . . . ." *Id.,* p 384. To be sure, this example was
employed to justify a limited view of the scope of "state law" in § 29,
not to describe the parameters of the state financed proportion of
necessary costs. Nevertheless, the manner in which we envisioned the
section operating is inconsistent with the local-to-local funding ratio
advocated by Justice LEVIN.

based on the fortuity of the district's share when Headlee became effective. Nothing in the text of the Headlee Amendment or any statement of the voters' purpose suggests that voters sought to freeze funding disparities regardless of changes in the wealth or need of a particular district over time.

### III

We also consider the plaintiffs' claim that the state is obligated to pay the employer's share of social security coverage for all school district employees. We agree with the Court of Appeals that plaintiffs' social security coverage claim is not cognizable under § 29 of the Headlee Amendment.

Plaintiffs sought to frame their social security costs claim as though social security coverage constituted a separate state-required activity or service. However, social security coverage is directly imposed by federal law and therefore not required by state law within the meaning of § 29. Second, social security coverage does not constitute an activity or service within the meaning of § 29. Therefore, regardless of the method of calculating the funding ratio, plaintiffs' claim for social security costs is defective.

### CONCLUSION

The opinions filed today reflect what must honestly be acknowledged as an attempt to fill the gap in the text of Headlee.[31] Thus, each illustrates the juridical reality that a commitment to judicial

---

[31] Justice Levin's approach focuses on the fact that the state is attempting to avoid the effect of the Headlee Amendment, while the opinion of the Chief Justice, *post,* p 275, correctly recognizes that the state is entitled to attempt to preserve its prerogatives as long as it does not violate it.

restraint and a desire to give effect to the meaning as understood and ratified by the voters does not end the process of constitutional construction where the text is indeterminate. We must examine a host of factors such as the common meaning of the text, the structure of the provision, and the historical context in which the amendment was passed. Legal argument founded on multiple factors can be characterized as "cable-like." Eskridge & Frickey, *Statutory interpretation as practical reasoning,* 42 Stanford L R 321, 351 (1990). The writers observe that "[t]he text, one probable purpose, some legislative history, and current policy each lend some—even if not unequivocal—support to the result. Each thread standing alone is subject to quarrel and objection; woven together, the threads" persuade that a particular result is in order. *Id.* The cable metaphor aptly describes the arguments in this case. The text, purpose, structure, and historical context all suggest that the strongest "cable" is woven from a state-to-local method. The theme of a single state obligation measured during the base year and the theme of state obligation owing to each local government are not logical alternatives but combinable strategies. So viewed, the strongest cable is that which winds together the Headlee Amendment's dual focus into a single strong whole—the state-to-local method.

We remand to the Court of Appeals for further proceedings consistent with this opinion. The Court of Appeals order of dismissal was based on theories developed by it without the benefit of full argument by the parties. Although this Court has had the benefit of briefing and argument regarding the method of measuring the state's obligation pursuant to § 29 and the social security coverage issue, there has been no opportunity to discuss the

remedy or to evaluate the viability of discrete claims of districts or individuals. We indicate no opinion regarding whether the method of measurement recognized today should be applied either fully retroactively or fully prospectively, or whether limited retroactivity is appropriate.

BRICKLEY, GRIFFIN, and MALLETT, JJ., concurred with BOYLE, J.

CAVANAGH, C.J. (*dissenting*). The issue presented in this case, one of first impression in this Court,[1] concerns the proper interpretation of the first sentence of § 29 of the Headlee Amendment, Const 1963, art 9, §§ 25-34. Contrary to the reasoning and conclusions reached in the opinions of my Sister BOYLE and my Brother LEVIN, I conclude that the "statewide-to-statewide" interpretation of this provision is the most persuasive, and I would accordingly affirm on that basis the judgment of the Court of Appeals, and dismiss without prejudice the plaintiffs' complaint.

### I. THE LANGUAGE OF § 29

As this Court has held, in order to properly interpret the meaning of the Headlee Amendment, "we must ascertain the intent of the voters who passed [it]." *Durant v State Bd of Ed,* 424 Mich

[1] My Sister BOYLE suggests that the dispositive issue in this case is actually governed by *Durant v State Bd of Ed,* 424 Mich 364; 381 NW2d 662 (1985). See *ante,* pp 256-260. My colleague admits, however, that *Durant* does not speak directly to the issue; rather, my colleague invokes certain alleged "implicit assumptions" in *Durant.* See *ante,* p 256. My colleague, however, departs from an express holding of *Durant,* by relying on the drafters' notes of the Headlee Amendment. See *ante,* p 257, n 24. But see *Durant,* 424 Mich 382, n 12 (finding the drafters' notes to be "of no value in this case," and citing the well-settled rule that "comments made after the adoption or passage of a statute or constitutional provision are given little weight").

364, 378; 381 NW2d 662 (1985). The starting point for that inquiry is "the language of the constitution itself." *Id.*

Section 29 of the Headlee Amendment provides:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

The dispositive issue in this case is the proper meaning of the language in the first sentence of § 29, "the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law." The question is whether that language refers to the state financed proportion of (1) the necessary costs of all activities and services required by state law of all units of local government, calculated on a statewide basis, (2) the necessary costs of each state-required activity or service taken individually, but calculated on a statewide basis with regard to all relevant units of local government, or (3) the necessary costs incurred by each unit of local government, taken separately, with regard to each state-required activity or service.

The first of these alternatives is clearly precluded by § 29's reference, in the singular, to "*any* existing activity or service." Clearly, the state must, with regard to each state-required activity

or service, maintain at least the same proportionate level of financing of that activity or service that prevailed in 1978-79. But does it follow that the state must maintain the same proportionate financing of the costs incurred by *each unit of local government* with regard to each activity or service, as under the third alternative? Nothing in § 29 suggests that. The relevant sentence refers to "unit*s* of Local Government" in the plural, not in the singular.[2] That reference occurs as part of the adjectival phrase, "required of units of Local Government by state law," which defines "existing activity or service." That adjectival phrase reflects the obvious fact that any given state-required activity or service will apply to a large number of local units across the state.[3] Because the language

---

[2] In a noteworthy contrast, the second sentence of § 29, dealing with state financing of new or increased state-required activities or services, refers to "unit of Local Government" in the singular, by way of prohibiting the state from adding new program obligations or increasing the level of existing program obligations on local governments, "unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs." Thus, the framers of § 29 were perfectly capable of referring to "unit of Local Government" in the singular when they wished to do so, and it would disregard the careful phrasing of § 29 to treat the plural reference to "units of Local Government" in the first sentence as if it were in the singular. Of course, it is entirely logical for the requirements of the second sentence of § 29 to apply on a local unit basis. The essence of the second sentence is to require that *all* new, increased costs resulting from new or increased state program requirements be one hundred percent funded by the state. This could not occur unless every unit's increased costs in that regard were funded one hundred percent.

[3] Contrary to an argument asserted by the plaintiffs, there is no logical conflict between the statewide-to-statewide interpretation and the fact that many state-required activities and services may not apply to all units of local government in the state. Section 29 refers to programs "required of units of Local Government," not programs "required of *all* units of Local Government." For example, the state-required programs primarily at issue in this case, see n 2 and accompanying text, apply to all school districts but not to other types of units of local government. The focus under the statewide-to-statewide interpretation is simply on the state financed proportion of the aggregate "necessary costs" *of each activity or service,* regardless of

refers to "the state financed proportion of the necessary costs *of any existing activity or service,*" it seems eminently logical to calculate the "necessary costs" on the basis of the aggregate costs incurred by all "units of Local Government" that are required to provide each activity or service.

Section 29 does not refer to "the state financed proportion of the necessary costs of *each unit of Local Government.*" If such a local-to-local interpretation had been intended, that meaning could have been conveyed in any number of clearer and more sensible ways. Section 29, for example, could have been phrased in relevant part as:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs *incurred by any unit of Local Government in providing* any existing activity or service required of units of Local Government by state law. [Emphasized words added.]

Or, perhaps less clearly:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of *any unit* of Local Government by state law. [Emphasized words added.]

In sum, because § 29 focuses on "the state financed proportion of the necessary costs of *any existing [state-required] activity or service,*" not on the state financed proportion of the necessary costs of *each unit of local government,* and because § 29 refers in the relevant sentence to "unit*s*" in the plural, the statewide-to-statewide interpretation

which category or categories of units of local government are required to provide that particular activity or service.

appears to be the most logical and persuasive way
to read the provision.[4]

## II. THE PURPOSE OF § 29

This Court has held that in attempting to deter-
mine the meaning of a constitutional provision,
" 'the circumstances surrounding the adoption of
[the] provision and the purpose sought to be ac-
complished may be considered.' " *Livingston Co v
Dep't of Management & Budget,* 430 Mich 635,
642; 425 NW2d 65 (1988), quoting *Traverse City
School Dist v Attorney General,* 384 Mich 390,
405; 185 NW2d 9 (1971).

The plaintiffs argue that the statewide-to-state-
wide interpretation undermines the purposes of
§ 29 and of the Headlee Amendment as a whole.
There can be little dispute about those purposes.
As this Court said in *Livingston Co,* 430 Mich 644:

> Th[e] plan is quite obvious. Having placed a
> limit on state spending, it was necessary to keep
> the state from creating loopholes either by shifting
> more programs to units of local government with-
> out the funds to carry them out, or by reducing
> the state's proportion of spending for "required"
> programs in effect at the time the Headlee Amend-
> ment was ratified.

I disagree, however, with the contention that the

---

[4] Inasmuch as I agree with my Brother LEVIN that "unit of Local
Government," as used in § 29, refers to individual units, including
individual school districts, I do not follow the logic of my colleague's
argument on pp 299-301, and I fail to see how that argument under-
cuts my analysis or advances that of my colleague. The issue is not
the definition of "unit of Local Government," which is not in dispute.
Rather, as my colleague concedes, see *post,* p 303, the primary issue is
the scope of the term, "the state financed proportion." While I rely in
part on the fact that "units" is rendered in the plural in the first
sentence of § 29, that has nothing to do with the definition of "unit of
Local Government" itself, and could not possibly conflict with the
"geographically limited" nature of a "unit of Local Government." Cf.
*post,* p 302.

statewide-to-statewide interpretation in any way conflicts with the plan or purposes of the Headlee Amendment. The plaintiffs argue essentially that the statewide-to-statewide interpretation would permit the state to reduce its proportionate funding of the costs incurred by some school districts,[5] while increasing its proportionate funding of others. This may be true, but it is irrelevant to the broad antishifting purpose of § 29. As the state notes in its brief, "[t]he state does not realize one nickel in savings if it allocates funds for a particular activity or service to school district A instead of school district B."[6]

As long as the state is prevented from shifting its funding responsibilities onto local governments on an overall, statewide basis, the goal of § 29 is fully realized and effectuated. Because that is precisely what the statewide-to-statewide interpretation does, in fact, prevent, that interpretation does not open up any loophole in the Headlee Amendment.[7]

---

[5] Specifically, of course, they argue that the state has reduced its proportionate funding of the plaintiff districts themselves.

[6] My Sister Boyle asserts that this is a "fallacy," ante, p 259, n 27, because it might, in fact, be more expensive for the state to finance any given equalization scheme if the state were simultaneously required to maintain certain wealthier school districts at a higher level of subsidy pursuant to § 29. The point of the state's argument, however, is that the state realizes no savings with regard to financing any particular state-required program, and thus, no shifting of the overall financial burden with regard to that program. That the statewide-to-statewide interpretation might make it easier for the state to pursue broader goals such as general funding equalization is not a reason to reject that interpretation. On the contrary, the fact that the local-to-local and statewide-to-local interpretations might make it effectively impossible for the state to pursue such equalization, by requiring the state to subsidize some wealthier districts in perpetuity at an unduly high level, is a very strong reason to doubt that the voters intended such unjust and irrational results. See part IV.

[7] The Headlee Amendment itself, in its introductory section, summarizes its intended effect by stating, in relevant part:

I do not suggest that there are no potential legal grounds upon which to challenge any particular school funding equalization scheme. There may be any number of grounds for such a challenge. But we are not presented in this case with any such issues. The sole issue before us is whether the plaintiffs have stated a claim under § 29. That provision simply has no bearing on the validity of any equalization or redistribution of state funds *among* school districts, *as long as the state does not attempt to shift its aggregate, statewide funding responsibilities, with regard to "any existing [state-required] activity or service," onto units of local government.* Because the plaintiffs in this case have not alleged any such aggregate, statewide shifting, their § 29 claim fails as a matter of law.[8]

---

Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval. The state is prohibited from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government. [Const 1963, art 9, § 25.]

The references to "local governments" or "local government" are in generalized terms suggesting the overall balance between state and local responsibilities in the aggregate, not the balance between state responsibilities and the responsibilities of any individual unit of local government. Section 25 does *not* indicate that the Headlee Amendment's purpose is to prohibit the state "from shifting the tax burden to *any unit of* local government."

[8] My Brother LEVIN asserts that the recapture provision in § 21(5) of the School Aid Act does, in fact, result in a statewide shifting of funding responsibilities in violation of § 29. *Post,* pp 294-295 (part III[A]). My colleague misses the point. I neither deny nor concede the possibility that the recapture provision may operate in such a manner. Certainly, an allegation of such improper statewide shifting would state a claim under § 29. *But the plaintiffs have not made any such allegation in this case.* No such claim or issue is before this Court in this case, and my colleague's discussion of it therefore constitutes dicta.

### III. THE RELEVANCE OF § 30

The plaintiffs, in urging the local-to-local interpretation of § 29, place heavy reliance on a comparison with § 30 of the Headlee Amendment, which provides:

> The proportion of total state spending paid to all units of Local Government, *taken as a group,* shall not be reduced below that proportion in effect in fiscal year 1978-79. [Emphasis added.]

The plaintiffs argue essentially that because the words "taken as a group" do not appear in § 29, there is no basis for interpreting § 29 in a way that treats "units of Local Government" in the aggregate, as under the statewide-to-statewide interpretation.

In my view, the § 30 comparison does not support the local-to-local interpretation of § 29, nor does it undermine the statewide-to-statewide interpretation. It was obviously necessary to include the words "taken as a group" in § 30 to avoid a potentially serious ambiguity in that provision. Without the words "taken as a group," § 30's reference to "state spending paid to all units of Local Government" might have been interpreted to mean state spending paid to *each and every* unit of local government. The effect would have been to freeze the allocation of state funds *among* all the units of local government.

No comparable ambiguity exists in § 29, and there was therefore no need to add words such as "taken as a group" to convey a statewide meaning already clearly evident from the text of § 29. A comparable ambiguity in § 29 might perhaps have existed if § 29 had been phrased as follows:

> The state is hereby prohibited from reducing the

state financed proportion of the necessary costs of
*all units of Local Government.* [Emphasized words
added.]

But as enacted, § 29 refers to "the state financed
proportion of the necessary costs of *any existing
activity or service* required of units of Local Gov-
ernment by state law." As we have already noted,
the concluding phrase, "required of units of Local
Government by state law," is simply an adjectival
phrase modifying "any existing activity or ser-
vice," which is the operative heart of the sentence.

It would not have been logical or coherent for
§ 29 to use the words "taken as a group," because
§ 29, unlike § 30, was not designed simply to pre-
serve a proportionate level of funding for all units
of local government, *for all purposes.* Rather, § 29
was designed to preserve a proportionate level of
funding with respect to each *"existing [state-
required] activity or service."* As I have already
demonstrated, however, nothing in the first sen-
tence of § 29 suggests that its requirements apply
*not only* to each state-required activity or service
but *also* to each unit of local government. To the
contrary, as I have noted, the plural reference to
"units of Local Government" suggests the opposite,
as does the fact that each given activity or service
will obviously apply to a large number of local
units.

Finally, while the plaintiffs vest paramount sig-
nificance in the absence of the words "taken as a
group" from the first sentence of § 29, it is difficult
to see where the words could have been inserted to
produce the sought-after clarification. If they had
been inserted following the words "units of Local
Government," they would only have created ambi-
guity and confusion by suggesting that only activi-
ties or services required of *all* units of local gov-

ernment were implicated. If they had been inserted at the end of the first sentence, their referent would have been ambiguous, and if the referent were taken to be "any existing activity or service," the plural implications of "taken as a group" would have conflicted inexplicably with the singular specification of "any existing activity or service."

In sum, the absence of the words "taken as a group" from § 29 does not undermine the statewide-to-statewide interpretation, because that interpretation already flows clearly from the existing language of § 29, because the words "taken as a group" serve a clarification purpose unique to § 30, and because adding the words "taken as a group" to § 29 would not have achieved any further clarity in that provision.[9] The relevant issue is not whether the requirements of the first sentence of § 29 apply to units of local government "taken as a group," but whether those requirements apply to state-required activities and services, taken individually. They clearly do, and this, in my view, leads with inexorable logic to the statewide-to-statewide interpretation.[10]

---

[9] For the reasons I have stated in this section, my analysis of § 29 does not rest on "read[ing] into § 29" the words "taken as a group," LEVIN J., *post,* p 304; nor, unlike my colleague, do I read the state's argument to rest on any such theory. I have no need to "read" anything "into" § 29 in order to arrive at the statewide-to-statewide interpretation. The whole point of my discussion in this section is to demonstrate that the appearance of the words "taken as a group" in § 30 does not, ultimately, have any relevance to the proper interpretation of § 29.

[10] The plaintiffs argue further that the statewide-to-statewide interpretation of § 29 would merely impose upon the state the identical obligations imposed by § 30, and thus render § 29 redundant and nugatory. This argument, however, is obviously erroneous. Nothing in § 30, standing alone, would prevent the state from reducing its proportionate level of financing of any given state-required activity or service, as long as the state continued to devote the same overall percentage of its budget as in 1978-79 to funding for all units of local government, taken as a group, for all purposes; yet § 29, under the

IV. POLICY IMPLICATIONS

This Court's interpretation of § 29 should not, of course, be swayed by the perceived policy implications. Our task is simply to arrive at the most persuasive and intellectually honest interpretation of § 29 that we can. But I find it nevertheless appropriate to point out, in view of the policy arguments raised by the parties, the amici curiae, and my colleagues, that the local-to-local interpretation of § 29, aside from being inherently unpersuasive, would, as the state argues, lead to irrational and inequitable consequences.

Under the local-to-local approach, the pattern of state funding of individual school districts would, to a large extent, be permanently frozen according to the pattern existing in 1978, when the Headlee Amendment was adopted. Not only would the local-to-local approach tend to preserve whatever funding inequities may have existed in 1978, but it would hinder the state from responding to even more pronounced inequities that may have developed over the last fourteen years, and that may continue to develop into the foreseeable future, as a result of changing economic and demographic circumstances within districts across the state.[11]

statewide-to-statewide interpretation, obviously does prohibit any reduction in proportionate funding of any state-required activity. Conversely, nothing in § 29, under any of the interpretations urged in this case, would necessarily prevent the state from dramatically increasing funding in areas of its budget other than aid to local governments, while freezing or increasing at a lower rate the amount of local aid, thereby reducing the overall proportion of local aid within the state budget. Yet § 30 obviously does prohibit any reduction in the overall proportion of local aid within the state budget.

[11] Under the local-to-local approach, if the state financed thirty percent and seventy percent, respectively, of the costs incurred by school districts A and B with regard to a particular state-required program in 1978-79, the state would remain obligated, from 1978 to the present, and into the foreseeable future, to continue financing both districts' costs at the same guaranteed minimum rate. This

By adopting the Headlee Amendment, the voters clearly intended to place strict limits on the growth of state taxation and spending. By including § 29, the voters clearly intended to prevent the state from evading the Headlee Amendment's restrictions by shifting its overall funding responsibilities onto local governments. But there is nothing in the language or background of the Headlee Amendment to support the conclusion that the voters intended to permanently freeze the *pattern* of state funding *among* school districts or other units of local government that happened to exist in 1978. I do not believe that Michigan voters intended to permanently immunize relatively wealthy school districts from the possible effects of funding equalization or redistribution schemes. I am aware of no evidence that such issues played any role at all in the debate or adoption of the Headlee Amendment. In any event, the amendment itself cannot fairly be read to require such a result.

### V. THE STATEWIDE-TO-LOCAL INTERPRETATION

My Sister BOYLE's opinion adopts the statewide-to-local interpretation first suggested as an option in our order granting leave to appeal, and urged before us by the MEA. While that interpretation might, at first glance, appear to be a superficially attractive compromise, it is clearly untenable as a

would remain the case even if, over time, school district A became the poorest district in the state, and school district B the wealthiest. This growing inequity might be further exacerbated if, as might be expected, the poorer district's costs with regard to certain state-required programs (such as bilingual education and lunch and supplemental milk programs) tended to increase as its economic and demographic profile shifted—for example, as a result of an influx of economically disadvantaged, non-English-speaking immigrants. Cf. *Plyler v Doe*, 457 US 202; 102 S Ct 2382; 72 L Ed 2d 786 (1982) (holding that even illegal immigrant children are constitutionally guaranteed equal access to public education).

construction of the language of § 29. It would require that the phrase, "the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law," be interpreted in a fundamentally different manner depending on whether the base year (1978-79) or the year of challenged funding was at issue.[12]

The relevant phrase, however, appears only once in § 29 and can have only one meaning. Whichever meaning is most persuasive must clearly apply both to the base year and the year of challenged funding.[13] I would therefore reject the statewide-to-local interpretation as no more persuasive than the local-to-local interpretation.[14]

[12] With regard to the year of challenged funding, the statewide-to-local interpretation, like the local-to-local interpretation, looks to the state financed proportion of the necessary costs incurred by each individual district with regard to each required program. With regard to the base year, however, the statewide-to-local interpretation looks to the statewide average proportionate financing of the necessary costs of each required program.

[13] The required comparison between the base year and the year of challenged funding is conveyed by § 29's language providing that "[t]he state is hereby prohibited from *reducing* . . . ." (Emphasis added.) *What* it is prohibited from "reducing" is set forth only once in the phrase that follows. The language simply does not allow for a different basis for calculating "the state financed proportion" in the year of challenged funding, as compared to the base year. A provision consistent with the statewide-to-local interpretation might perhaps have been phrased as follows:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs incurred by any unit of Local Government in providing any existing activity or service required of units of Local Government by state law, below the level of the overall state financed proportion, in the year of the adoption of this amendment, of the total necessary costs of any existing activity or service required of units of Local Government by state law.

[14] Furthermore, I doubt very much whether the statewide-to-local interpretation is, in fact, a desirable compromise even in practical policy terms. It appears that it would, like the local-to-local interpretation, lead to irrational and inequitable consequences. By perma-

My colleague attempts to evade the logical impossibility of the statewide-to-local interpretation by stressing that the first and second sentences of § 29 must be read together, and by stressing that the first sentence refers to "*the* state financed proportion . . . ." See BOYLE, J., *ante,* pp 249-251. I agree that it is generally appropriate to read a constitutional provision as a whole. In this instance, however, the different language of the first and second sentences of § 29 does not contain the key to the puzzle sought by my colleague. While the first and second sentences are obviously related, they address distinct and separable issues. The first sentence is a self-contained provision governing the funding of programs that were required by state law at the time the Headlee Amendment was passed. The second sentence is a self-contained provision governing the funding of new programs mandated by post-Headlee Amendment state laws. I have already acknowledged and discussed the obvious fact that the second sentence, *in contrast to the first sentence, does* "apply on an individual unit basis." See n 2. Indeed, as I have noted, that very contrast in language supports the statewide-to-statewide interpretation with regard to the first sentence. See n 2.

My colleague asserts that "[t]he only language in § 29 that speaks directly to payment occurs in the second sentence . . . ." BOYLE, J., *ante,* p 251. But this is not really true, and does not support the conclusion that my colleague draws. It is true that the second sentence in § 29 contains a more

nently freezing every individual school district at the same guaranteed minimum proportion of state funding—the statewide average proportion prevailing in the base year—the statewide-to-local interpretation would take no account of the widely differing economic circumstances of districts throughout the state, *both* in the base year *and* in the face of potentially dramatic changes in later years in the relative wealth and poverty of different districts.

explicit reference to the state's duty to "appropriat[e]" and "disburse[ ]" the required funding to local governments, but this refers only to the separate requirements imposed by the second sentence. The first sentence independently refers to the state's payment responsibility in the year of challenged funding, by providing that the state *shall not* "reduc[e]" the proportionate funding level existing when the Headlee Amendment was passed, which is simply another way of saying that the state *shall* maintain and continue paying that proportionate amount of funding.[15]

The fact that the first sentence in § 29 refers to "*the* state financed proportion" does not support the statewide-to-statewide, the statewide-to-local, *or* the local-to-local interpretation, and simply does not provide the guidance discerned by my colleague. It is impossible to say, on the sole basis of the use of the word "*the*," whether "*the* state financed proportion" refers to the proportion as measured on a statewide or local unit basis. Consider a hypothetical constitutional provision stating: "The state shall annually appropriate to each unit of local government *the* amount of funds required by each unit to provide adequate police services." The use of "the" does not necessarily imply or require that the term modified by "the" be a unique, unitary, or statewide entity. "[T]he

[15] My colleague suggests that the essence of her approach is to somehow blend or combine the elements of the first and second sentences of § 29, as opposed to, in her words, "viewing these two approaches as embodying conflicting principles requiring a choice . . . ." BOYLE, J., *ante*, pp 253-254. I do not see any "conflict" between the first and second sentences under my interpretation, however, and I do not "choose" between their respective "approaches," because, as noted in the text, the two sentences are each self-contained, address distinct issues, and impose distinct requirements. This case involves *only* the issue governed by, and the requirements imposed by, the first sentence. To mix and match the language of different portions of the Headlee Amendment results in a distortion of the precise and carefully wrought meaning of that language.

state financed proportion" in § 29, like "*the amount of funds*" in our hypothetical provision, *could* refer to the multiplicity of varying amounts or proportions of funding relevant to different local units. The argument for the statewide-to-statewide interpretation rests not on the use of the word "the," but primarily, as a textual matter, on the grounds I have stated in part I.

Shifting from textual to more broadly theoretical and policy-based arguments, my Sister BOYLE joins my Brother LEVIN in asserting that the statewide-to-statewide interpretation might theoretically permit the state to engage in some bizarre, extreme, or irrational form of funding redistribution, such as the hypothesis that the state might "fund[ ] the cost of all mandated services in one county and none in the other eighty-two," BOYLE, J., *ante,* p 258, or the notion that the state might inadvertently, through the operation of the complex factors governing funding redistribution, "shift funds from poorer districts to wealthier . . . ." *Ante,* p 258, n 25.

This "parade-of-horribles" type of argument misses the point in my view. I have already noted that "[t]here may be any number of grounds," apart from the Headlee Amendment provision at issue, "upon which to challenge any particular school funding equalization scheme." See part II, *ante,* p 270. More to the point, it would simply be unreasonable to suppose that the Headlee Amendment was designed or intended to prohibit or forestall any conceivably unwise, unfair, or even evil state fiscal policy that might be imagined. The first sentence of § 29 of the Headlee Amendment, as its text reveals, has the specific and limited objective of preventing any overall shifting of funding responsibilities for state-mandated programs from the state onto local governments. As I

have discussed in part II, the statewide-to-state-
wide interpretation fully vindicates this objective.
That there may be many unwise, unfair, or even
evil state policies that would *not* be prohibited by
§ 29 under the statewide-to-statewide interpreta-
tion is a meaningless and irrelevant observation
that would be true of any constitutional provision.
As a wise judge once said:

> The process of Constitutional adjudication does
> not thrive on conjuring up horrible possibilities
> that never happen in the real world and devising
> doctrines sufficiently comprehensive in detail to
> cover the remotest contingency. [*New York v
> United States,* 326 US 572, 583; 66 S Ct 310; 90 L
> Ed 326 (1946) (opinion of Frankfurter, J., joined by
> Rutledge, J.).]

My Sister BOYLE takes me to task for what she
describes as my "assumption that the drafters of
the [Headlee] [A]mendment were content to let the
acceptability of discrete decisions within the aggre-
gate responsibility, be evaluated in the polling
place." *Ante,* p 259. Translated into plain English,
this amounts to the proposition that, to the extent
the state is not governed by constitutional re-
straints, it is free to do whatever it wants to do,
subject only to the democratic verdict of the vot-
ers. I would heartily embrace this proposition,
which I had thought was fundamental to our form
of government. While I recognize that my col-
league and I have an honest difference of opinion
regarding the scope of the constitutional restraint
at issue, I reject the notion that my analysis is
flawed simply because it would leave some funding
and distribution decisions by the state, within the
overall confines of the Headlee Amendment, to the
democratic judgment of the political process. As
Chief Justice John Marshall once said:

> The wisdom and the discretion of [the members

of the Legislature], their identity with the people, and the influence which their constituents possess at election, are, in this, as in many other instances, . . . the sole restraints on which they have relied, to secure them from [the] abuse [of power]. They are the restraints on which the people must often rely solely, in all representative governments. [*Gibbons v Ogden,* 22 US (9 Wheat) 1, 197; 6 L Ed 23 (1824).]

### VI. THE SOCIAL SECURITY ISSUE

I turn finally to the plaintiffs' social security claim, as described in my Sister BOYLE's opinion, pp 246-247. This claim suffers from a number of infirmities. First of all, the obligation of units of local government to pay the employer share of social security taxes is directly imposed by federal law, see *ante,* p 246, n 10, and thus is not "required . . . by state law" within the meaning of § 29.

Second, social security coverage is not itself an "activity or service" within the meaning of § 29. MCL 21.232(1); MSA 5.3194(602)(1) provides:

"Activity" means a specific and identifiable administrative action of a local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not an administrative action.

MCL 21.234(1); MSA 5.3194(604)(1) provides:

"Service" means a specific and identifiable program of a local unit of government which is available to the general public or is provided for the citizens of the local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not a program.

I agree with these definitions of "activity or ser-

vice" for purposes of § 29,[16] and they clearly exclude a general employee benefit such as social security coverage.

It is also clear, however, that the cost of social security coverage for an employee engaged in carrying out any "activity or service required of units of Local Government by state law" does constitute part of the "necessary costs" of such an activity or service. This follows from the definition of "necessary costs" adopted in *Durant,* 424 Mich 389-391. Indeed, the state concedes this point in this case.[17]

Thus, the state would violate § 29 if any reduction of the state financed proportion of local government social security coverage costs resulted in a reduction, as compared to 1978-79, of "the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law." However, as I have noted, the plaintiffs in this case have not

[16] The quoted statutory provisions are part of the definitional sections of the legislation enacted by 1979 PA 101 to implement the Headlee Amendment. Legislation enacted subsequent to the adoption of a constitutional amendment cannot, of course, be given much, if any, weight in ascertaining the intent of the voters who adopted the amendment. Cf. *Durant,* 424 Mich 382, n 12 (disclaiming reliance on the drafters' notes published after the adoption of the Headlee Amendment). This Court, not the Legislature, has the ultimate authority and responsibility to interpret the meaning of any law or constitutional provision, see *Romein v General Motors Corp,* 436 Mich 515, 539, n 20; 462 NW2d 555 (1990), aff'd 503 US —; 112 S Ct 1105; 117 L Ed 2d 328 (1992), and we have not hesitated in the past to reject legislative interpretations of the Headlee Amendment that we find to be inconsistent with the true meaning intended by the voters. See *Durant,* 424 Mich 391-392 (rejecting the legislative definition of "necessary costs" under the Headlee Amendment). In this instance, however, I find the legislative definition persuasive and I would adopt it.

[17] By the same token, the cost of social security coverage for employees engaged in general educational services apart from any specific state-required program would not be counted as part of the "necessary costs" of any such program. As this Court held in *Durant,* 424 Mich 377-387, to whatever extent the mandate of Const 1963, art 8, § 2, guaranteeing free public elementary and secondary education, applies either to the state or local governments, it does not constitute a requirement of "state law" within the meaning of § 29.

alleged any such reduction under the statewide-to-statewide interpretation of § 29 that I would adopt; nor, for that matter, have they alleged any such reduction under the statewide-to-local interpretation adopted by my Sister BOYLE. Thus, the social security component of the plaintiffs' complaint does not state a claim under § 29.

### VII. CONCLUSION

I would adopt the statewide-to-statewide interpretation of the first sentence of Const 1963, art 9, § 29. Under that approach, the proper comparison for purposes of assessing the state's compliance is between the state financed proportion in 1978-79, and in the year of challenged funding, of the total necessary costs incurred by all relevant units of local government, statewide, in providing the state-required activity or service at issue.[18] In accordance with that interpretation, I would affirm the judgment of the Court of Appeals and dismiss without prejudice the plaintiffs' complaint.

---

[18] My Brother LEVIN mischaracterizes the state's argument and my analysis by repeatedly asserting that they are premised on the theory that the state may comply with § 29 by simply "tentatively allocat[ing]" funding to units of local government, rather than actually providing such funding. See post, pp 287-288, 290, 295-296, 298. Nothing in my opinion even remotely suggests such a theory, nor do I understand the state to suggest such a theory. Obviously, the state's compliance with § 29 must be measured by funding that is actually provided, not that which is merely "tentatively allocated." Obviously, if the "music" were indeed "stop[ped] . . . immediately after the allocation," as my colleague suggests, post, p 287, and if the subsequent adjustments in funding pursuant to the recapture provision were deemed legally irrelevant, the plaintiffs' entire argument, and my entire analysis responding to that argument, would be moot and pointless. As I have made perfectly clear, my analysis is premised, not on the state's "tentative allocation" of funding, but on the fact that *the plaintiffs have not alleged that the recapture provision has caused any actual reduction of proportionate state funding on a statewide basis.*

The statewide-to-statewide versus local-to-local issue, far from being a "red herring," post, p 295, is the central and dispositive issue in this case, to which the parties have devoted virtually all their briefing and argument.

Levin, J. (*dissenting*). One of the Headlee Amendments to this state's constitution, § 29 of article 9, bars the Legislature from reducing the proportion of the necessary cost of an activity or service required by state law of units of local government.[1]

When § 29 was added to the constitution in 1978, state law required school districts to provide special education, supplemental milk and lunch programs, special education transportation, and bilingual education.[2]

The principal question presented is whether the state violated § 29 by reducing, since the base fiscal years, "state financed proportion" funding actually paid to some school districts but not to others for special education, supplemental milk and lunch programs, special education transportation and bilingual education programs. The other question is whether the state violated § 29 when, in 1989, it shifted to local school districts the cost of paying social security taxes by no longer funding the full employer's share as it did in the base fiscal year 1978-79.[3]

---

[1] Section 29 provides:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. [Const 1963, art 9, § 29.]

[2] See MCL 380.1751; MSA 15.41751 (special education), MCL 380.1272a; MSA 15.41272(1) (lunch and supplemental milk program), MCL 380.1756; MSA 15.41756 (special education transportation), and MCL 380.1153; MSA 15.41153 (bilingual education).

[3] Plaintiffs, fifty-one school districts and resident taxpayers, brought an action in the Court of Appeals pursuant to Const 1963, art 9, § 32.

MCL 388.1621(5); MSA 15.1919(921)(5) was amended by 1990 PA

We would conclude that the state violated § 29 when it reduced funding actually paid to particular school districts for mandated programs, and that social security taxes are a necessary cost of providing mandated services.

I

This Court observed, in the opening round of this controversy, *Durant v State Bd of Ed,* 424 Mich 364, 378; 381 NW2d 662 (1985), that the Headlee Amendments were added to this state's constitution[4] as part of a "nationwide 'taxpayer revolt.'" The Court added that the "intent of the voters" was "to lower taxes and put a *ceiling on state spending.*"[5]

Section 29, the principal Headlee Amendment here at issue, providing that "[t]he state is hereby prohibited from reducing the *state financed proportion* of the necessary costs of any existing activity or service required of units of Local Government by state law,"[6] was added as part of that taxpayer's revolt in an effort, this Court said, "to limit legislative expansion of requirements placed on local government, to put a *freeze* on what they perceived was excessive government spending,"[7] so "that there be *no shift of responsibility for services from the state to the local governments* without adequate compensation"[8] from the state treasury to the local treasuries.

---

207, § 21(5) to allow allocations for social security to be counted when figuring the recapture percentage.

[4] Const 1963, art 9, §§ 25-34, added by voter ratification, November, 1978.

[5] *Id.,* pp 390-391 (emphasis added).

[6] Const 1963, art 9, § 29.

[7] *Durant,* p 378.

[8] *Id.,* p 391 (emphasis added).

In a subsequent case,[9] this Court similarly observed that § 29 was designed to bar the state from shifting the cost of activities or services required by state law to local units of government:

> *Having placed a limit on state spending,* it was necessary to keep the state from creating loopholes either by *shifting* more programs to units of local government without the funds to carry them out, or by *reducing the state's proportion of spending for "required" programs in effect* at the time the Headlee Amendment was ratified.

This Court further observed in *Durant* that § 29 requires that the "actual cost" of providing the state-mandated service or activity *"must be paid"*[10] by the state to the local unit of government; Headlee sought to bar additional "taxes both at the local and the state level"[11] without voter approval.

These themes are also summarized in introductory § 25 of the Headlee Amendments, which provides that neither *"state spending"* nor property or other *local taxes* may be increased "without *direct voter approval,"* and that the state is prohibited "from shifting the tax burden to local government."[12]

---

[9] *Livingston Co v Dep't of Management & Budget,* 430 Mich 635, 644; 425 NW2d 65 (1988) (emphasis added).

[10] *Id.,* p 391 (emphasis added).

[11] *Id.,* p 378.

[12] Sec. 25. *Property taxes and other local taxes and state* taxation and *spending may not be increased* above the limitations specified herein *without direct voter approval. The state is prohibited* from requiring any new or expanded activities by local governments without full state financing, *from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government.* A provision for emergency conditions is established and the repayment of voter approved bonded indebtedness is guaranteed. Implementation of this section is specified in Sections 26 through 34, inclusive, of this Article. [Emphasis added.]

A

The statutory scheme challenged by the plaintiffs embodies a budgetary dissimulation that would enable the state to avoid the Headlee "ceiling on state spending" by shifting to relatively wealthy school districts the cost of additional state spending to provide aid to poorer school districts.

The Attorney General asks this Court to validate this statutory scheme by declaring that the state complies with § 29's edict—that there shall be no reduction in the proportion of the necessary costs of state-mandated programs—instanter, without actual payment, upon enactment of an appropriation bill that tentatively "allocates" to all school districts, wealthy and poor, the amounts required by § 29 to be paid.[13] The Attorney General would stop the music immediately after the allocation, ignoring that it is further provided in the

[13] School financing is administered within the framework of the School Aid Act, MCL 388.1601 et seq.; MSA 15.1919(901) et seq., which provides for two types of funding: restricted and unrestricted.

"Unrestricted," or membership, funds are those that can be used for any school-related purpose permitted by law. Restricted, or "categorical," funds are those that are earmarked for specific programs. Some programs receiving categorical funding are adopted voluntarily, e.g., vocational training, while others are mandated by state law, e.g., special education.

The state allocates unrestricted funds according to a formula set forth in § 21(1) of the act, MCL 388.1621; MSA 15.1919(921), that guarantees to each district a minimum amount of funding per pupil on the basis of the district's levied millage rate. The amount of unrestricted funds per pupil equals the difference between the amount guaranteed and the amount per pupil generated from local revenues. The formulas for allocating categorical funds vary with each category of service.

Districts are eligible to receive unrestricted funds if the amount of revenue per pupil generated by local taxes does not exceed the amount of funds guaranteed per pupil by the state. Districts receiving unrestricted funds are said to be "in-formula." Districts where local revenues exceed the state-guaranteed amount, thus disqualifying them from receiving unrestricted aid, are said to be "out-of-formula." Generally, wealthier districts are out-of-formula, while poorer districts are in-formula.

School Aid Act that there shall be deducted and recaptured to the state treasury amounts so tentatively allocated to wealthy school districts.[14]

The Attorney General would thus treat the tentative allocations of the amounts required to be paid pursuant to § 29 as satisfying the state's obligation to avoid reducing the proportion of the necessary costs even though the amounts tentatively allocated will not, by reason of the recapture, be fully paid to wealthy school districts.

In a word, what is "allocated" need not be paid in order to comply with § 29, although this Court recognized in *Durant* that the proportion of the actual cost "must be paid" to effectuate the goals of Headlee.

The result is that the sums recaptured from the tentative allocations are nothing more than bookkeeping entries, and need not actually be "paid."

---

[14] To aid in-formula districts, which rely more heavily on state aid than do those that are out-of-formula, the act contains a "base revenue reduction," or "recapture," provision that allows the state to reduce, within limits, the amount of aid going to out-of-formula districts. The recaptured funds are redistributed to in-formula districts.

For the 1990-91 year, the act limits the percentage applied in the operation of the base revenue deduction to no more than ninety-nine percent, and limits the amount recaptured statewide to $72,093,600. MCL 388.1621(6), (8); MSA 15.1919(921)(6), (8). The recapture provision operates by reducing the amount of aid going to an out-of-formula district by an amount equal to the percentage of state aid to which the district would be entitled absent any recapture. The applicable percentage is calculated according to formulas set out in MCL 388.1621(5); MSA 15.1919(921)(5).

The first sentence of the complex recapture provision is set forth in § 21(5) of the School Aid Act:

> If a district has more than 500 pupils and if the net allocation computed for a district pursuant to subsection (1) is a negative amount, it shall be applied as a deduction against any funds otherwise tentatively allocated to the district under all other sections of this act.

Other applicable provisions are subsections (4), (6)-(8), MCL 388.1621; MSA 15.1919(921).

The tentative allocations are thus a sham, unless there is recognition that, by reason of the recapture, the amount tentatively allocated is not the actual allocation.

B

In *Durant, supra,* p 388, this Court held that § 29 does not require that unrestricted state aid[15] to school districts be maintained at the level provided in the Headlee base fiscal year (1978-79) because the Legislature had not required school districts to offer a "core curriculum," and hence unrestricted state aid is not funding for an existing activity or service required of local units of government by state law. "Only specific, identifiable programs required to be provided by school districts by statute or agency rule are included under § 29."[16]

"Specific, identifiable" funding programs are referred to in the School Aid Act as restricted or categorical funding. There are thus two kinds of state school aid: unrestricted and restricted (categorical).[17] Having decided in *Durant* that § 29 does not require the state to maintain the same level of unrestricted aid, the question remained whether § 29 required the state to maintain the same level of restricted or categorical aid.

The dissent contends that § 29 does not require the state to provide each school district with the proportion of the cost of maintaining state-mandated programs extant when the Headlee Amendments were ratified by the people, but only so requires with regard to new or enlarged man-

[15] See n 13.
[16] Reporter's syllabus accompanying *Durant,* p 366.
[17] *Id.*

dated activities.[18] Thus, unless there are new, post-Headlee mandated programs,[19] the Attorney General's construction of § 29 would in effect eliminate § 29 in its entirety as an obstacle to transferring all restricted or categorical school aid from wealthier to relatively poorer school districts.

The Attorney General's construction neuters § 29's prohibition against reducing the proportion of the necessary costs of pre-Headlee state-mandated programs. Section 29, as construed by the Attorney General, no longer would bar the state from shifting to wealthier school districts the entire cost[20] of maintaining in those school districts pre-Headlee state-mandated programs without any compensation from the state.

Insofar as pre-Headlee mandated programs are concerned, school districts, for all practical purposes, would be read out of § 29 as "local units of government." But the Attorney General's construction of § 29 is not limited to school districts. The allocation/recapture charade provides the means of neutering § 29 with regard to all pre-Headlee state-mandated programs, thereby enabling the state to shift to local units of government the cost of providing funds for the "proportion"—so that there is no longer in actuality any proportion—of any pre-Headlee state-mandated programs, and thereby freeing up the "saving" achieved for expanded state spending for any purpose at the expense of local taxpayers who must either accept a reduction in other local services or

---

[18] *Ante*, p 266, n 2.

[19] Attorney General opinions almost uniformly conclude that post-Headlee enactments do not mandate new programs, and thus that § 29 is not applicable.

[20] The entire amount tentatively allocated to the wealthier school districts has not, as yet, been deducted or recaptured, but the tendency of the legislation, moving from a cap of $15,500,000 to over $72,000,000, appears to be in that direction.

vote for increased taxes at the local level to provide the funds needed to pay the proportion of the necessary costs of providing the pre-Headlee state-mandated service. The state thereby increases state spending with money provided by local governments.

Local units of government had the option, before the adoption of the Headlee Amendments, of paying for state-mandated programs by raising taxes or reducing nonmandated programs. Section 29 was not added to the constitution to preserve to local units of government those pre-Headlee options.

In voting for the Headlee Amendments, taxpayers were not voting for an abstraction, the reduction of the level of taxes generally, but rather were primarily seeking "to lower their [own] taxes both at the local and state level." *Durant, supra,* p 378. Taxpayers sought primarily to reduce the taxes they personally are obliged to pay, not only the sum total of all the taxes paid by all taxpayers, "statewide/taken as a group"[21] in the aggregate.

---

[21] Another section, § 30, of the Headlee Amendments bars the Legislature from reducing the proportion of total state spending paid to all units of local government "taken as a group" below the proportion in the base fiscal year 1978-79. Section 30 provides:

> The proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79. [Const 1963, art 9, § 30.]

The phrase "taken as a group" set forth in § 30 does not appear in § 29; for purposes of § 29, units of local government are not to be taken as a group.

The Court of Appeals concluded that § 29 does not require that the state pay the same proportion, as in the base fiscal years, of providing such programs to every school district. See *Schmidt v Michigan,* unpublished order of the Court of Appeals, entered November 9, 1990 (Docket No. 132677). The Court said that § 29 is satisfied if the state provides "all school districts in the state, considered 'as a group' " the cost of providing such mandated programs in all school districts. The social security claim was also dismissed. *Id.*

II

The roots of this controversy precede Headlee. There is an imbalance in the wealth of school districts that reflects the imbalance in wealth in society.

The Legislature and the Governors in all three administrations since Headlee was adopted have sought to increase state school aid funding of relatively poor school districts.

A

Transferring state school aid from relatively wealthy to relatively poor school districts may be, and in the minds of many is, a laudatory goal. That three Governors—two from one political party and one from another—and the Legislature have year after year, on an ever-increasing scale, enacted this diversion of school aid from relatively wealthy to relatively poor school districts, is testimony that there is wide political support for this legislative-gubernatorial action.

The end does not, however, justify the means.

Constitutions divide and limit the powers of government. Although the goal may be laudatory, it is the function of this Court to thwart the Legislature and the Governor in accomplishing even a laudatory goal by unconstitutional means.

B

The vice of the allocation/recapture charade is that it enables the state to do precisely what Headlee sought to prevent. Instead of reducing other state spending to provide the $15,500,000 in

1980, $72,000,000[22] today, and $79,000,000 in fiscal 1992-93,[23] that the Legislature and Governors have desired to provide in additional funding for the poorer school districts, the School Aid Bill was amended in 1980, and annually thereafter, to provide for the ever-increasing deduction or recapture from the categorical school aid tentatively allocated to the relatively wealthy school districts.[24]

The result is that the wealthier school districts adversely affected must increase the level of taxation to maintain pre-Headlee mandated school programs, thereby shifting from the state to local school districts, albeit relatively wealthy, the burden of providing the funds required to enable the Legislature and the Governor to provide the additional funding for the poorer school districts without reducing other state spending or seeking voter approval for an increase in state taxes.

C

The Attorney General argues that the state does not save a nickel because the recaptured amount nevertheless is appropriated for school aid—unrestricted school aid—to the poorer school districts. The dissent accepts this half-truth.

Every nickel that is paid in additional funding to poorer school districts is a nickel that wealthier school districts must provide from other sources— either by reduction in nonmandated programs or increased taxation—in order to maintain the pre-Headlee state-mandated program. This is clearly

[22] Some of this cap on the total amount to be recaptured will affect categorical programs that are not mandatory, and hence not subject to the limitations of § 29.

[23] 1992 PA 148.

[24] The recapture language describes such school districts as "out of formula," i.e., districts that receive no unrestricted school aid, that have more than five hundred pupils.

violative of the letter—state *"spending may not be increased;"* the state is prohibited "from *shifting the tax burden to local government"*[25]—and the spirit of Headlee whereby, as expressed by this Court in *Durant,* "taxpayers were attempting to *limit legislature expansion of requirements placed on local government,* to put a *freeze on* what they perceived was excessive government *spending,* and to *lower their taxes both at the local* and the state level."[26]

### III

The dissent concludes that the " 'statewide-to-statewide' interpretation" of § 29 advocated by the Attorney General is more persuasive[27] than the "local-to-local" interpretation[28] advocated by the plaintiffs.

### A

The dissent further states that because the plaintiffs in this case have not alleged any "aggregate, statewide shifting," their § 29 claim fails as a matter of law.[29] The dissent explains that an aggregate statewide shifting does not occur "as long as the state does not attempt to shift its aggregate, statewide funding responsibilities, with regard to 'any existing [state-required] activity or service,'

[25] See n 12.

[26] See ns 7 ff and accompanying text.

[27] *Ante,* p 264.

Under the dissent's statewide-to-statewide interpretation, the required state financed proportion is "the necessary costs of each state-required activity or service taken individually, but calculated on a statewide basis with regard to all relevant units of local government . . . ." *Id.,* p 265.

[28] Under the "local-to-local" approach, as defined by the majority, the state financed proportion is "the necessary costs incurred by each unit of local government, taken separately, with regard to each state-required activity or service." *Id.*

[29] *Id.,* p 270.

onto units of local government."[30] (Emphasis deleted.)

It is apparent, however, from the face of the recapture provision, that the recapture in fact shifts to wealthier school districts the portion of the "aggregate, statewide funding responsibility" that is recaptured. Money tentatively allocated to the wealthier school districts for the pre-Headlee state-required programs is recaptured by the state, to be used to partially fund additional unrestricted funding for poorer school districts.

B

The debate over whether the statewide or local unit of government interpretation is the correct interpretation of § 29 is a red herring. It makes no difference whether the proportionate share is computed statewide/as a group/in the aggregate or, alternatively, on a local unit of government basis. The critical leap is the notion that compliance with § 29 occurs instanter when a tentative allocation is made without regard to whether the state is actually obliged to pay the money so allocated.

If tentative allocation is viewed in isolation, without regard to the recapture or whether the money tentatively allocated is actually paid, the state achieves compliance with § 29 under either approach, statewide or local. If, on the other hand, tentative allocation is not viewed in isolation, but rather the underlying reality of the allocation/recapture charade—the money recaptured is not, in fact, paid to the school district for the mandated programs—is recognized, then the state does not achieve compliance with § 29 under either approach, statewide or local.

The critical question then is not statewide or

[30] *Id.*

local, but whether one looks at the tentative allocation in isolation or, rather, looks at the net result after deduction of the amount recaptured.

We would look at the net result rather than focus on the fiction that compliance with § 29 occurs instanter upon the tentative allocation without regard to the recapture or whether the amount recaptured is actually paid to the school district to which tentatively allocated, or is in truth used to defray the cost of additional state spending to increase unrestricted school aid to poorer school districts.

C

The linguistic arguments, of the majority[31] and the dissent,[32] ignore the cardinal rule of constitutional construction recently again recognized in *Altman v Meridian Twp,* 439 Mich 623, 636; 487 NW2d 155 (1992), where this Court quoted approvingly the following statement in an earlier decision of this Court:

"The primary and fundamental rule of constitutional or statutory construction is that the Court's duty is to ascertain the purpose and intent as expressed in the constitutional or legislative provision in question. Also, *while intent must be inferred from the language used, it is not the meaning of the particular words only in the abstract or their strictly grammatical construction alone that governs. The words are to be applied to the subject matter and to the general scope of the provision, and they are to be considered in light of the general purpose sought to be accomplished or the evil sought to be remedied by the constitution or statute.*" [*White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979).] [Emphasis added.]

[31] *Ante,* pp 249-251, 254-255.
[32] *Id.,* pp 264-268.

The dissent states in effect that because the first sentence of § 29 speaks of "units of Local Government" in the plural, and the second clause of the second sentence speaks of payment to a "unit of Local Government" in the singular,[33] actual payment to each unit of local government of the state financed proportion is not required for a pre-Headlee mandated service, but is required for a new activity or service or an increase in the level of any activity or service beyond that required by existing law.

In *Durant,* however, this Court said:

> The first sentence, the one at issue in this case, is aimed at existing services or activities already required of local government. The second sentence addresses future services or activities. Both sentences clearly reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to the local government, once its revenues were limited by the Headlee Amendments, in order to save the money it would have had to use to provide the services itself.
>
> Because they were aimed at alleviation of *two possible manifestations of the same voter concern,* we conclude that the language "required by the legislature or any state agency" in the second sentence of § 29 must be read together with the phrase "state law" in the first sentence. This interpretation is consistent with the voters' intent that *any service or activity required by the Legislature or a state agency, whether now or in the future, be funded at an adequate level by the state and not by local taxpayers. [Id.,* pp 379-380. Emphasis added.]

The dissent's linguistic differentiation of the mandate of the first and second sentences of § 29

---

[33] The first clause also speaks of "units of Local Government" in the plural.

ignores that they are both "two possible manifesta-
tions of the same voter concern," and that the
voters intended that "any service or activity re-
quired by the Legislature or a state agency,
*whether now* or in the future, be funded at an
adequate level by the state and not by local tax-
payers." (Emphasis added.)

D

Under the dissent's construction, if, when Head-
lee was adopted, the state was paying, say, twenty
percent of the necessary costs of providing jails,
probation officers, and courts, the Legislature
could combine the appropriation for corrections,
jails, courts, and the state police in one appropria-
tion bill, and tentatively allocate to each county its
proportion of the necessary costs of providing jails
and courts, but provide that in those counties
where the jails have an aggregate capacity of more
than five hundred beds[34] a sum of money equal to
the amount appropriated to such a county for jails
and courts shall be deducted and recaptured,
thereby enabling the state to increase the appro-
priation for corrections or the state police without
reducing a nickel of other state spending.

That § 29 had been violated would be clear if it
was the one court of justice's ox that was being
gored, if the Chief Justice had to go to Wayne
County or, if it has more than five hundred beds,
Oakland County, and demand that those counties
nevertheless provide the same amount of money
for jails and courts so that the orderly administra-
tion of justice could continue.

[34] The recapture provision applies only to school districts having
more than five hundred pupils.

IV

At the heart of the present controversy is the first sentence of § 29 which reads:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. [Const 1963, art 9, § 29.]

We find further support for our conclusion not to read "taken as a group" into "units of Local Government" in the context of § 29, as well as the definitional language of the Headlee Amendments, and the legislation implementing it.[35]

Considered in context, § 29 and § 30 cannot properly be read interchangeably. Section 30 provides:

> The proportion of total state spending paid to all units of Local Government, *taken as a group,* shall not be reduced below that proportion in effect in fiscal year 1978-79. [Const 1963, art 9, § 30. Emphasis added.]

Both § 29 and § 30 refer to "units of Local Government," but only § 30 specifies that such "units" are to be "taken as a group." This suggests that "taken as a group" clarifies "units" for the purposes of § 30, and that "units" functions differently in § 30 than in § 29 and other sections.

"Local Government" is defined in the Headlee Amendments as

> any *political subdivision of the state, including,*

---

[35] We do not wish to be understood as suggesting that the Legislature can define what words in the constitution mean. But a contemporaneous legislative construction of what words in the constitution mean is, relevant when the constitutional provision limits legislative power, and the contemporaneous construction contravenes subsequent legislative efforts to avoid the limitations on its power.

*but not restricted to, school districts,* cities, villages, townships, charter townships, counties, charter counties, authorities created by the state, and authorities created by other units of local government. [Const 1963, art 9, § 33. Emphasis added.]

Because school districts are a species of "local government," the reference in § 29 to "units" of local government connotes a governmental entity smaller than a group comprised of all school districts in the state, and suggests that § 29 speaks of individual school districts.[36]

The legislation implementing the Headlee Amendments defines "Local unit of government" as

a *political subdivision* of this state, *including school districts,* community college districts, *intermediate school districts,* cities, villages, townships, counties, and authorities, *if the political subdivision has as its primary purpose the providing of local governmental services for residents in a geographically limited area of this state* and has the power to act primarily on behalf of that area. [MCL 21.233(5); MSA 5.3194(603)(5). Emphasis added.]

The section thus distinguishes between "school districts" and "intermediate school districts," considering either alone to be a "local unit of government," and implying that individual districts, not districts as a group, are "local units."

Individual school districts provide government services for residents in "geographically limited" areas. The construction advocated by the Attorney

---

[36] This is the correct reading of § 29 even if one were to indulge the assumption that "school districts" in § 33 means "school districts as a group." According to the Attorney General's approach, § 29 and § 33 should be read together as meaning "school districts as a group." Even so read, § 29 means a unit of government less than all school districts in the state.

General conflicts with this definition. Reading
"taken as a group" into any reference to school
districts or units of local government would elimi-
nate the concept of a "geographically limited
area" in the definition of a local unit of govern-
ment. If "school districts taken as a group" desig-
nates all school districts in the state, then school
districts would be geographically unlimited.

V

The Attorney General and amici curiae assert
that the plain language of § 29, arguable policy
implications of the construction for which we
write, and the purpose that prompted adoption of
the Headlee Amendments, support reading "taken
as a group" into § 29.

A

The Court of Appeals disposition is reflected in
two orders. The Court dismissed the complaint for
failure to state a cause of action, saying:

> [N]o conclusory factual claim is made that corre-
> sponding reductions in unrestricted aid will cause
> the *overall state contribution to local school ser-*
> *vices and activities across all school districts in the*
> *state to fall below that mandated by Constitution*
> *1963, art 9, § 29.* Plaintiffs claim only that individ-
> ual districts will receive a lower percentage of
> their budgets than was the case in 1978-79; this is
> insufficient to state a cause of action, *unless state*
> *aid falls short of the level mandated by article 9,*
> *§ 29 as to all districts in the state, considered "as a*
> *group." Durant v State Bd of Ed,* 424 Mich 364,
> 392-393 (1985). [Order entered November 9, 1990
> (Docket No. 132677). Emphasis added.]

The Court's reliance on *Durant* was erroneous.

The passage cited concerned the construction of § 30, not § 29.[37]

In denying rehearing, the Court of Appeals provided a different rationale for its disposition:

> The "taken as a group" principle of Const 1963, art 9, § 30 applies to the present compliant, brought under the first sentence of article 9, § 29. *That provision of the State Constitution speaks of "units of Local Government" in the plural only.* [Order entered January 14, 1991 (Docket No. 132677). Emphasis added.]

The Court implied that the plural form of "unit" refers to the entire class of similar units, and thus that a claim would have been stated only if § 29 referred to "necessary costs of any . . . activity or service required of *a unit* of local government."

For the reasons stated in part IV, we are persuaded that "units" functions differently in § 29 than in § 30.

B

The Attorney General argues that the first sentence of § 29 requires the state to maintain funding for the necessary costs of required "activities" or "services," and does not require the state to

---

[37] In *Durant,* this Court did not read the "taken as a group" language set forth in § 30 into § 29. In the passage from *Durant* cited by the Court of Appeals, this Court said:

> The term "taken as a group" clearly requires that the overall percentage allotment of the state budget for local units of government must remain at 1978 levels. . . . We affirm the Court of Appeals affirmance of the circuit court's conclusion that *§ 30 only* requires that state funding of all units of local governments, taken as a group, be maintained at 1978-79 levels. [*Durant, supra,* p 393. Emphasis added.]

maintain funding of the costs of "units of local government."[38]

The Attorney General's argument is selective and strained. Section 29 bars a reduction in the *state financed proportion*" of the "necessary costs" of any "activity or service" required by law of "units of Local Government." The issue central to this dispute is the meaning of "state financed proportion."

The Attorney General contends that the "state financed proportion" required to be maintained under § 29 is the amount of funding provided *statewide* for mandated programs. Plaintiffs assert that the "state financed proportion" means the amount provided by the state to each *local* school district. An argument that avoids addressing the meaning of "state financed proportion," in terms of how the proportion should be calculated, ignores the constructional issue in dispute.[39]

---

[38] The Attorney General argues:

> The necessary costs of which the state must maintain its financed proportion are those of any "activity or service." The phrase "required of units of Local Government by state law" is a participial phrase modifying "activity or service." To reach plaintiffs' construction, it would be necessary to rewrite the sentence to prohibit the state from reducing the proportion of costs of "units."

[39] Amicus curiae Detroit Federation of Teachers argues that "taken as a group" should be read into § 29 so that it harmonizes with Const 1963, art 8, § 2 which reads:

> The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law.

The DFT asserts that unless "taken as a group" is read into § 29, the Legislature will not have the discretion needed to reallocate funds from "wealthier" to "needier" school districts in service of the mandate to provide free elementary and secondary public education.

The argument mirrors arguments made by the Attorney General and, if adopted, would eliminate § 29 in the context of school financing.

C

The Attorney General contends that "taken as a group" should be read into § 29 to avoid absurd and inequitable results. He maintains that unless "taken as a group" is read into § 29, § 29 will perpetuate funding inequities among school districts by continuing funding for mandated programs at 1978-79 levels, in effect freezing district entitlements according to the fortuities of circumstances as they were in 1978-79, and impair the ability of school districts to respond to changing economic circumstances.

The Attorney General's argument, in essence, is that the Headlee Amendments were a bad idea. Our task is to construe § 29.[40] The voters approved an amendment to the Constitution that fixes 1978-79 as the base fiscal year.[41]

D

The Attorney General argues that his construction of § 29 implements the intent of the Headlee Amendments to strengthen local control of government and that a contrary construction would generate overinvolvement by the state in the affairs of school districts. This argument assumes that reading "taken as a group" into § 29 would avoid the state "microanalyzing" each claim by a local district for reimbursement for mandated services.

Whether "taken as a group" is read into § 29 or not, a determination of the "state financed propor-

---

[40] In a theme similar to the "changing economic circumstances" argument of the Attorney General, amicus curiae MEA argues that the construction of § 29 it favors, part VI would provide ready guidance for funding mandated programs in school districts created after the enactment of the Headlee Amendment. It would be possible, however, to establish the level of funding in new districts by comparing them to the districts from which they were carved.

[41] Const 1963, art 9, § 30.

tion of the necessary costs" of mandated services in each school district is necessary. We recognize that the state has a legitimate concern with avoiding inaccurate claims. We fail to see, however, how that concern differs meaningfully whether there is a determination of the state financed proportion of funding for mandated services in a particular school district for a Headlee Amendments base fiscal year, or there is a determination for a particular school district under the recapture provision of the School Aid Act.[42]

E

We also find unpersuasive the Attorney General's argument that "taken as a group" should be read into § 29 because that is the only construction that preserves the "historical discretion" of the Legislature to allocate resources among competing constituencies, and the "taken as a group" reading of § 29 facilitates redistribution of funds from wealthier to needier school districts. This argument ignores that when the voters amend the constitution, they generally do so to limit governmental power, and that here they amended the constitution to limit legislative discretion to shift the burden of supporting state-mandated governmental services from the state to local units of government.

The Headlee Amendments were enacted to limit the discretion of the Legislature. Voters sought to limit legislative discretion to mandate new programs for local governments, without funding them.

---

[42] The dissent argues that the "statewide interpretation" of § 29 is correct: "If such a local-to-local interpretation had been intended, that meaning could have been conveyed in any number of clearer and more sensible ways." *Ante*, p 267.

Similarly it can be argued that clearer language could have been used to express the statewide interpretation favored by the dissent.

F

In conclusion, if "taken as a group" is read into § 29, and the state may recapture funds allocated to mandatory educational programs, taxpayers in "wealthier" districts will face the meaningless choice either of raising taxes or cutting back on nonmandated core educational programs.

State law requires school districts to provide special education, supplemental milk and lunch, bilingual education, and special education transportation programs. If the state may take funds for these mandated services away from some school districts and reallocate them to others, the school districts that lost funds would be obliged to compensate to fulfill their state-imposed obligations. Mandated programs would then be funded with money obtained either from cutbacks in nonmandated programs or increased taxes.

This choice is really no choice. This Court has held that neither education generally, nor any core curriculum is an "activity or service required . . . by state law" for purposes of the limitations set forth in § 29.[43] The "taken as a group" construction would effectively require local taxpayers to choose between raising their taxes, or cutting back on English, math, and science courses and significant traditional extracurricular activities.[44] In approving a tax relief measure, the voters did not intend to put traditional core educational programs at risk.

The Headlee Amendments do not insulate school districts from making difficult financial choices. Obliging local units of government to increase taxes in response to a reduction of funding for

[43] *Durant, supra,* pp 378, 388.

[44] Such activities would most likely include athletics, music, drama, and driver education.

state-mandated programs cannot properly be characterized as a "tough financial decision" consistent with the spirit of the Headlee Amendments. Nor could it be properly characterized as anything other than a "shift" of a burden from the state to local school districts.

The dissent would invest § 29 with only minimal antishifting effect:

> As long as the state is prevented from shifting its funding responsibilities onto local governments *on an overall, statewide basis,* the goal of § 29 is fully realized and effectuated. [*Ante,* p 269. Emphasis added.]

Such a narrow reading of § 29 would effectively deprive many school districts of any protection under § 29. The "statewide interpretation" of § 29 would allow the state to do incrementally what it is otherwise prohibited from doing comprehensively. Districts that are forced, for all practical purposes, to raise taxes to meet state-mandated spending obligations would be left only with the abstract comfort of knowing that not all school districts faced the same "tough financial decision."

## VI

The majority rejects both the statewide-to-statewide approach, advocated by the Attorney General, adopted and set forth in the dissenting opinion, and the local-to-local approach advocated by the plaintiffs and adopted in this dissenting opinion. The majority adopts the approach, dubbed "state-to-local," advocated by amicus curiae Michigan Education Association.

The MEA argued that the "state financed proportion of the necessary costs" of mandated programs should be determined by first calculating the per-

centage of total state aid provided in 1978-79 to all districts "taken as a group" for a particular mandated activity. All local districts would then receive that same proportion of aid for that activity every year. Thus, if the state funded, on a statewide average, fifty percent of the costs of special education in 1978-79, each district would continue to receive funding for fifty percent of the necessary costs of its special education program every year without regard to whether the proportion of funding received by that district in the base year was above or below the state average.

The MEA contends that this approach is simpler to administer because it requires only a single calculation of overall state funding, and also because it would establish a guideline for funding mandated programs in districts created after the Headlee Amendments were enacted.[45]

The state-to-local approach of the MEA has the same flaw as the statewide-to-statewide approach advocated by the Attorney General. The MEA approach still presents particular districts with Hobson's choice: raise taxes or reduce core curricula.

The majority, in arguing for the state-to-local approach, states:

> When the voters ratified the Headlee Amendment, they sought to ensure that when the state mandates a program, funds are provided to the local government to pay for that program. The state-to-local method of calculating the state's obligation achieves the voters' desire to secure a minimum level of funding for the local government unit for mandatory programs and to link the mandating of programs with the necessity for taxing to pay for those programs. This approach also creates the appropriate balance between the state's desire for discretion in allocating funds and

[45] Concerning funding of districts created post-Headlee, see n 40.

the desire of the local units of government for minimum funding. The state-to-local ratio provides a uniform allocation of resources for mandatory programs.[46]

Neither the "state's desire for discretion in allocating funds" nor the "desire of the local units of government for minimum funding" is relevant. The people resolved the policy questions when the Headlee Amendments were adopted. The majority departs from the Court's prior constructions of the Headlee Amendments in seeking a balance between the state's "desire" and the "desire" of local units of government.

Some units of local government will be advantaged by the state-to-local approach and others disadvantaged. It is unclear whether relatively wealthy school districts, as a group or in particular, will be advantaged or disadvantaged or poorer districts, as a group or in particular, will be advantaged or disadvantaged.

We repeat what we said earlier in this opinion:

> In voting for the Headlee Amendments, taxpayers were not voting for an abstraction, the reduction of the level of taxes generally, but rather were primarily seeking "to lower their [own] taxes both at the local and state level." *Durant, supra,* p 378. Taxpayers sought primarily to reduce the taxes they personally are obliged to pay, not only the sum total of all the taxes paid by all taxpayers, "statewide/taken as a group" in the aggregate. [*Ante,* p 291.]

## VII

We next consider whether the state is obliged to pay the employer's share of the costs of social

---

[46] *Ante,* p 252.

security coverage for school district employees.[47] We would hold that social security coverage is part of the state financed proportion of the necessary costs of providing mandated services under § 29, but not of providing education generally.

A

When the Headlee Amendments were enacted, the state funded fully the employer's share of the costs of social security coverage for all school employees. Since 1986, federal law has made local school districts directly liable to the federal government for social security obligations.[48] Since 1989, state law has provided for the recapture from "wealthier" school districts and reallocation to "needier" school districts of funds dedicated to social security coverage for school employees.[49]

We conclude, on the basis of *Durant, supra,* p 378, that to the extent state funds were allocated in the base years for social security coverage

[47] The Court of Appeals held that plaintiffs' Social Security claim was not cognizable under the Headlee Amendments. See Order entered November 9, 1990.

[48] Section 9002 of PL 99-509 (enacted October 21, 1986) amends section 218 of the [Social Security] Act [42 USC 418] and Subchapter C of Chapter 21 of the Internal Revenue Code of 1954 by *removing the States' fiscal liability for their political subdivisions' Social Security contributions and requiring States and political subdivisions to pay Federal Insurance Contribution Act taxes in the same manner that private employers do. Administration and collection of these taxes is transferred from SSA to IRS.* The amendments are effective for payments due on wages paid in 1987 and later years. [53 Fed Reg 32973 (August 29, 1988). Emphasis added.]

[49] MCL 388.1621(5); MSA 15.1919(921)(5), as amended by 1989 PA 197.

In 1986, a change in the federal law made local school districts directly liable for social security obligations. See n 48. Subsequently, the School Aid Act was amended so that the state allocated the employer's share of FICA directly to each school district, which would then forward the money to the federal government. MCL 388.1746; MSA 15.1919(1046), as added by 1987 PA 128.

of employees engaged in general education, the funds were *not* used to defray a necessary cost of an activity or service required by state law. To the extent, however, that state funds were then allocated for social security coverage of employees engaged in mandated programs, such funds defrayed "necessary costs"[50] of providing mandated services.

**B**

The Attorney General contends that § 29 allows the state to reallocate funds dedicated to social security coverage because social security coverage is not mandated by state law, and that, even if it were, it is not an "activity" or "service" within the meaning of the Headlee Amendments. The Attorney General also argues that redistribution of social security funds prevents inequities that result from voluntary decisions of "wealthier" districts, as well as state overinvolvement in local decision making.

We agree that social security coverage is not mandated by *state* law.[51] Federal law mandates

---

[50] The cost of social security coverage qualifies as a "necessary cost" as defined in *Durant, supra,* pp 390-391.

[51] The original agreement extending social security coverage to state employees, authorized by 42 USC 418, was entered into on December 17, 1951. The agreement, signed by the acting commissioner for Social Security and the chairman of the State Employees Retirement Board, contained the following permissive language:

The undersigned . . . hereby agree to extend, in conformity with section 21E of the Social Security Act, as amended, the insurance system established by Title II of the Social Security Act, as amended, to services performed by employees of the State and employees of those political subdivisions of the State . . . .

* * *

[Public school employees approved the agreement] by a secret ballot . . . held on Dec. 14-15, 1955 . . . .

social security coverage.[52]

We also agree that social security is not a service within the meaning of the Headlee Amendments implementing legislation:

> "Service" means a specific and identifiable program of a local unit of government which is available to the general public or is provided for the citizens of the local unit of government. *The provision of a benefit for, or the protection of, public employees of a local unit of government is not a program.* [MCL 21.234(1); MSA 5.3194(604)(1). Emphasis added.]

School employees are public employees of school districts, and school districts are local units of government. Social security is a benefit provided to school employees, and thus is not a "service" for purposes of the Headlee Amendments. Accordingly, even if there were a state mandate for social security, the strictures of the Headlee Amendments would not be triggered by a reallocation of funds formerly dedicated to pay social security costs.

The Attorney General has acknowledged that social security is a necessary cost of providing mandated services.[53] Accordingly, § 29 requires that the cost of funding social security coverage

---

Under the agreement, the state could terminate coverage, in whole or in part, "upon giving at least two years' advance notice in writing to the Administrator . . . ."

[52] In 1983, Congress amended 42 USC 418 to eliminate the termination provisions in social security agreements. See PL 98-21, § 103. The amendment bars state and local governments from terminating coverage for their employees unless the termination had taken effect before the date of enactment of the amendment.

[53] The Attorney General argues:

> The activities or services provided by plaintiff school districts are various educational courses. Some of these courses, such as drivers' education, are required by state law and are activities and services within the ambit of art 9, § 29. *Durant [v Dep't of*

for employees engaged in the delivery of mandated services be included in the calculation of the "necessary costs" of those services in each school district.

C

While "wealthier" school districts might increase salaries of school employees in mandated programs, and thereby increase the burden of providing social security coverage for those employees, the Headlee Amendments were not enacted, as the Attorney General's argument implies, to equalize the financial status of school districts. The Attorney General's argument in this regard also ignores the attendant increase in the financial burden that a school district would assume to "take advantage of" state funding of social security coverage.

D

The Attorney General again raises the specter of state overinvolvement in local decisions as a consequence of state funding of social security coverage. If it is true, as the argument assumes, that state control inexorably follows state funding, this militates against *any* state funding, not just the funding of social security for a limited number of school employees.

---

*Ed (On Second Remand),* 186 Mich App 83, 100-101; 463 NW2d 461 (1990)]. *In providing these activities and services, plaintiffs may need to employ personnel, such as drivers' education instructors. The essential costs incurred in employing these persons are "necessary costs" of the activity or service. These costs will include wages and fringe benefits, such as insurance benefits and social security.* Items of employee compensation are clearly not, however, themselves activities or services. [Emphasis added.]

Also relevant is that until recently the state, by subsidizing social security coverage for school districts, was engaged in exactly what is now contended constitutes state overinvolvement. Nor has the Attorney General provided evidence of actual "overinvolvement" arising out of social security coverage. In all events, if funding social security coverage in "wealthier" school districts poses the risk of state overinvolvement, reallocation of those funds to "needier" school districts would pose the same risk.

We would reverse and remand to the Court of Appeals for the entry of such orders as may be necessary to implement this opinion.

RILEY, J., concurred with LEVIN, J.